720 F.2d 595
 1984 A.M.C. 97
 In the Matter of the Complaint of BOWOON SANGSA CO., LTD.,
as Owner of the M/T Bowoon No. 7 for Exoneration
From or Limitation of Liability.
BOWOON SANGSA CO., LTD., Complainant and Appellant,
v.
MICRONESIAN INDUSTRIAL CORPORATION, Appellee.
 No. 81-4174.
 United States Court of Appeals,
Ninth Circuit.
 Argued March 9, 1982.
Submitted Aug. 1, 1983.
Decided Oct. 25, 1983.
 
 Erich P. Wise, Graham & James, Long Beach, Cal., for complainant and appellant.
 George L. Waddell, Dorr, Cooper & Hays, San Francisco, Cal., for appellee.
 Appeal from the District of Guam, Territory of Guam.
 Before HAYNSWORTH,* TRASK, and WALLACE, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Appellant Bowoon Sangsa Co. (Bowoon) is a Korean corporation with its principal place of business in Seoul, Korea. Appellee Micronesian Industrial Corp. (MIC) is incorporated under the laws of the Trust Territory of the Pacific Islands and conducts business in Palau. Coconut oil belonging to MIC was loaded onto Bowoon's vessel in Koror, Palau, for shipment to ports in California. While leaving the harbor, the ship grounded on a reef. In order to free the vessel, the Master jettisoned approximately 1,530 metric tons of coconut oil--over one-half of the shipment. After she was refloated, the ship proceeded to Korea for repairs.
 
 
 2
 MIC immediately filed suit for the loss of its cargo in the Trial Division of the High Court of the Trust Territory, Palau District. Six months later, Bowoon filed a petition in the District of Guam for limitation of liability pursuant to 46 U.S.C. Secs. 183(a), 185. The district court issued a temporary restraining order against the commencement or continued prosecution of any actions against Bowoon resulting from the grounding of its ship. MIC moved for modification of the restraining order to allow it to continue with the suit filed earlier against Bowoon in Palau. After examining the geographic relationship of the parties, as well as the location of the accident and the vessel, the court indicated the claims resulting from the grounding of the Bowoon ship were not within the jurisdiction of any United States judicial district. Consequently, Bowoon's limitation petition was dismissed for lack of venue and failure to state a claim for limitation of damages. MIC's suit against Bowoon was subsequently transferred from the Trust Territory High Court to the Supreme Court of the Republic of Palau, where it is now pending.
 
 
 3
 We conclude that the district court misinterpreted the venue rules relating to limitation complaints, and erred in refusing to enjoin MIC's lawsuit pending before the court in Palau. We therefore reverse the judgment of the district court.
 
 
 4
 * As a threshold question we must determine if the district court order is reviewable. The denial, modification, or dissolution of an injunction in a limitation proceeding is appealable as a matter of right under 28 U.S.C. Sec. 1292(a)(1). Complaint of Mucho Kay, Inc., 578 F.2d 1156, 1157 (5th Cir.1978). Here, however, Bowoon appeals from the dissolution of a temporary restraining order, a decision that ordinarily is not appealable under section 1292(a)(1). Sohappy v. Smith, 529 F.2d 570, 572 (9th Cir.1976) (per curiam). The question, therefore, is whether the temporary restraining order in this case may be characterized as a preliminary injunction for purposes of appeal under section 1292(a)(1).
 
 
 5
 Courts examine the effect of an interlocutory order rather than its terminology in determining reviewability under 28 U.S.C. Sec. 1292(a)(1). E.g., Sampson v. Murray, 415 U.S. 61, 86-87, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); Tagupa v. East-West Center, Inc., 642 F.2d 1127, 1129 (9th Cir.1980); Hotel & Restaurant Employees and Bartenders International Union v. Rollison, 615 F.2d 788, 793 n. 15 (9th Cir.1980). The two factors generally considered determinative are: (1) whether the order extends beyond the twenty-day limit established by Federal Rule of Civil Procedure 65; and (2) whether the district court's decision was preceded by notice and an adversary hearing. Sampson v. Murray, 415 U.S. at 86-87 & n. 58, 94 S.Ct. at 951 & n. 58; Lewis v. S.S. Baune, 534 F.2d 1115, 1121 (5th Cir.1976); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure, Sec. 3922, at 32-36 (1977).
 
 
 6
 Here, both factors are present. The order continued in effect for approximately four months. The parties received a substantial adversary hearing on the motion for modification of the restraining order. We conclude that for purposes of section 1292(a)(1) the order appealed from was a preliminary injunction, and we therefore have jurisdiction to consider Bowoon's appeal.[1]
 
 II
 
 7
 We turn next to the issue of venue. A complaint for limitation pursuant to the Limitation of Liability Act, ch. 43, 9 Stat. 635 (1851) (codified as amended at 46 U.S.C. Secs. 181-189) (the Act), permits a vessel owner to limit its liability for damage or loss arising out of a particular voyage to the value of the vessel plus pending freight charges (compensation for the carriage of goods) at the termination of the voyage.[2] See, e.g., Black Diamond Steamship Corp. v. Robert Stewart & Sons, Ltd. (The Norwalk Victory), 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754 (1949). The Act permits both American and foreign shipowners facing multiple suits arising out of one voyage to bring the claimants into one proceeding to apportion the owner's liability. Provided their lawsuits are subject to the orders of a district court, all damage claimants may be enjoined from maintaining separate suits and required instead to file their claims in the limitation proceeding. Jung Hyun Sook v. Great Pacific Shipping Co., 632 F.2d 100, 103 (9th Cir.1980).
 
 
 8
 We find that the district court erred in its interpretation of the rule governing venue of limitation petitions. Under rule F(9) of the Supplemental Rules for Certain Admiralty and Maritime Claims,[3] if a ship has been lost or is in a foreign country and no suit has been commenced nor attachment made in any district, the complaint may be filed in any district. Venue for Bowoon's petition is proper in the Guam district court under this provision because Bowoon's vessel is in Korea and no damage suits have been filed nor attachments made in any United States district. We find that the court erred in holding that venue was improper in Guam.
 
 III
 
 9
 MIC argues that even if the district court erred in dismissing the case on venue grounds, its decision may be sustained on an alternative ground. MIC claims that an order from the district court cannot restrain the proceedings in Palau because the courts of Palau are independent foreign courts. Bowoon responds that the Trust Territory is not a foreign jurisdiction for purposes of limitation of damages in admiralty cases.[4] The district judge recognized this issue, but because he decided the case on venue grounds he was not required to pass on it. To resolve this question we must review not only legal precedent on the effect of limitation proceedings, but also the recent history of Palau and its judicial institutions.
 
 A.
 
 10
 The nature and effect of limitation proceedings were first explored by the Supreme Court in Oceanic Steam Navigation Co. v. Mellor (The Titanic), 233 U.S. 718, 34 S.Ct. 754, 58 L.Ed. 1171 (1914). There, the owner of the British flagship Titanic filed a petition in the United States to limit its liability. American and English claimants alike argued that English limitation law should govern. Unlike the federal statute, English law provided a fund for recovery even though the ship was lost. The Court, however, held that litigants who chose to sue the owner of the Titanic in this country were limited in their recovery by American limitation laws. The Court stated:
 
 
 11
 It is true that the act of Congress does not control or profess to control the conduct of a British ship on the high seas.... [and] that the foundation for a recovery upon a British tort is an obligation created by British law. But it also is true that the laws of the forum may decline altogether to enforce that obligation on the ground that it is contrary to the domestic policy, or may decline to enforce it except within such limits as it may impose. It is competent therefore for Congress to enact that in certain matters belonging to admiralty jurisdiction parties resorting to our courts shall recover only to such extent or in such way as it may mark out.
 
 
 12
 Id. at 732, 34 S.Ct. at 755 (citations omitted). Significantly, the Court held that American limitation law "might be applied to foreign ships if sued in this country although they were not subject to our substantive law." Id. at 733, 34 S.Ct. at 756. The Court's ruling indicates that a limitation proceeding is procedural rather than substantive in nature and that the forum should apply its own law.[5] See id. at 733-34, 34 S.Ct. at 756; G. Gilmore & C. Black, The Law of Admiralty, 939 (2d ed. 1975) (hereinafter Gilmore & Black).
 
 
 13
 As a corollary to these propositions, "the decree in a limitation proceeding is given merely a domestic and not an international recognition." Gilmore & Black, at 944; see British Transport Commission v. United States, 354 U.S. 129, 142, 77 S.Ct. 1103, 1110, 1 L.Ed.2d 1234 (1957); Jung Hyun Sook v. Great Pacific Shipping Co., 632 F.2d at 102 & n. 7; In re Bloomfield Steamship Co., 422 F.2d 728, 736 (2d Cir.1970); In re Bloomfield Steamship Co., 227 F.Supp. 615, 617 (E.D.La.1964), aff'd, 363 F.2d 872 (5th Cir.1966) (per curiam), cert. denied, 386 U.S. 913, 87 S.Ct. 864, 17 L.Ed.2d 785 (1967). As the Supreme Court stated in The Titanic, 233 U.S. at 732, 734, 34 S.Ct. at 755, 756:
 
 
 14
 The question is not whether the owner of the Titanic by this proceeding can require all claimants to come in and can cut down rights vested under English law, as against, for instance, Englishmen living in England who do not appear.
 
 
 15
 ....
 
 
 16
 We see no absurdity in supposing that if the owner of the Titanic were sued in different countries, each having a different rule affecting the remedy there, the local rule should be applied in each case.
 
 
 17
 The owner whose ships travel in international trade may expect suit "[w]herever he may have assets subject to arrest, within whatever national boundaries his ships may move to take on and discharge passengers or cargo." Gilmore & Black, at 945; see In re Bloomfield Steamship Co., 422 F.2d at 736. Because a decree in limitation normally receives only domestic recognition, "[t]he courts of each country will apply local law on the question of limitation; no country will give effect to a foreign limitation decree as barring further suit." Gilmore & Black, at 945. In short, limitation judgments do not have extraterritorial effect and claimants who abstain from filing damage claims in courts of the United States are free to pursue actions in foreign tribunals. Thus, the question before us is whether the courts of Palau should be treated as "foreign" courts which are not subject to orders issued in conjunction with limitation proceedings brought in a United States district court.
 
 B.
 
 18
 Palau is a part of the Trust Territory known as Micronesia. The international agreement under which the Trust Territory was established and the administration of the Trust Agreement by the United States have been described at length elsewhere.[6] To summarize, the United States exercises powers of administration, legislation, and jurisdiction over Micronesia by agreement with the United Nations. Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301; T.I.A.S. No. 1665 (Trusteeship Agreement). This authority is subject to the provisions of the Trusteeship Agreement, including article 6 which directs the United States to promote the economic self-sufficiency and self-government of the territory inhabitants under the supervision of the United Nations. The United States Congress delegated its administrative responsibility under the Trusteeship Agreement to the President, Act of February 20, 1929, ch. 281, 45 Stat. 1253 (codified as amended at 48 U.S.C.A. Sec. 1661(a) (West Supp.1983) ), who then delegated it to the Department of Interior, Exec. Order No. 11021, 27 Fed.Reg. 4409 (May 9, 1962). In 1968, the Secretary of Interior established a local government in Micronesia, Secretarial Order No. 2918, 34 Fed.Reg. 157 (Jan. 4, 1969) (Order 2918), with judicial authority vested in a High Court consisting of a trial division and an appellate division. Id. at part IV; 5 Trust Territory Code Sec. 52 (1980).
 
 
 19
 The system of government in the Trust Territory currently is in a transitional phase as the political subdivisions of the area move toward self-government and the termination of the Trusteeship Agreement. See Gale v. Andrus, 643 F.2d 826, 829-30 (D.C.Cir.1980); see also U.S. Department of State, 1981 Trust Territory of the Pacific Islands, Annual Report of the United States to the United Nations No. 34, 15-22 (U.N. Report). Negotiations to determine the future status of the Trust Territory have continued for nearly a decade. See P. Manhard, The United States and Micronesia in Free Association: A Chance To Do Better? 5 (National Security Affairs Monograph No. 79-4, June 1979). Two options have been seriously considered: commonwealth status or "free association." As a United States commonwealth, similar to Guam, the inhabitants of the Trust Territory would become United States citizens subject to its laws and legal processes. Alternatively, a status of free association[7] with the United States would afford full internal self-government: United States sovereignty would not apply, the inhabitants would not become United States citizens, and United States laws would apply only by mutual agreement. Also, the Micronesians would have the right to modify or terminate the Trusteeship Agreement unilaterally. A third option was independence for the territory. Id.
 
 
 20
 As a result of these negotiations, the United States agreed in 1975 to grant United States Commonwealth status to the Northern Mariana Islands. Congress approved the plan in 1976. See Joint Resolution of March 24, 1976, Pub.L. No. 94-241, 90 Stat. 263 (codified at 48 U.S.C.A. Sec. 1681, at 243 (West Supp.1983)). This covenant is contingent on the final termination of the Trusteeship Agreement and the Northern Mariana Islands remain part of the Trust Territory until that time. Id. at article X (48 U.S.C.A. Sec. 1681, at 251 (West Supp.1983)). The remaining districts of the Trust Territory, including the Federated States of Micronesia (Kosrae, Yap, Ponape, and Truk), the Marshall Islands, and Palau, have opted for free association status with the United States. Counsel for Bowoon has advised us, however, that in a 1983 plebiscite, the citizens of Palau voted against the proposed compact of free association, thus leaving the present relationship between Palau and the United States somewhat uncertain.
 
 
 21
 To facilitate the transfer of governmental functions from the Trust Territory government to those political subdivisions that had initially opted for free association, the Secretary of the Interior issued an order in 1979 entitled "Recognition of Governmental Entities under Locally-Ratified Constitutions in the Trust Territory of the Pacific Islands." Secretarial Order No. 3039, 44 Fed.Reg. 28116 (May 14, 1979) (Order 3039). Section 1 of the order states:
 
 
 22
 The purpose of this Order is to provide the maximum permissible amount of self-government, consistent with the responsibility of the Secretary under Executive Order 11021, for the Federated States of Micronesia, the Marshall Islands, and Palau, pursuant to their respective constitutions as and when framed, adopted, and ratified, pending termination of the 1947 Trusteeship Agreement ....
 
 
 23
 Id. at Sec. 1, 44 Fed.Reg. at 28116. See also Secretarial Order No. 3027, 43 Fed.Reg. 49858 (Oct. 25, 1978).
 
 
 24
 Pursuant to this authority, Palau has adopted its own constitution which became effective January 1, 1981. See Palau Const., reprinted in Trust Territory Code, part V, at 425-41. Palau now elects its own government officials and, to some extent, conducts its legislative and judicial functions independently of the other entities in Micronesia. Under article X of the new Constitution, the judicial power of Palau is "vested in a unified judiciary, consisting of a Supreme Court, a National Court, and such inferior courts of limited jurisdiction as may be established by law." Id. at art. X, reprinted in Trust Territory Code, part V, at 434. Cases pending in the trial division of the Trust Territory High Court may be transferred, according to the discretion of the Chief Justice of the High Court, to the newly authorized lower courts of Palau. Order 3039, at Sec. 5(b), 44 Fed.Reg. at 28118.[8] Despite the creation of these local lower courts, the appellate division of the High Court retains certiorari jurisdiction over appeals from "the courts of last resort of the respective jurisdictions of the Federated States of Micronesia, the Marshall Islands, and Palau." Id.
 
 
 25
 MIC argues that in view of the largely independent status of Palau and the increasingly limited role of the United States as trustee for the territory, the courts of Palau are not subject to orders issued in conjunction with limitation proceedings brought in American courts. We disagree. The recent movement toward independence masks the extent to which the courts of Palau are still dominated by the United States. The High Court, which continues to establish the law of the island through exercise of its appellate jurisdiction, has a substantial American flavor. Its justices are appointed by the Secretary of the Interior. Order No. 2918, at part IV, 34 Fed.Reg. at 160. Regular article III judges and territorial judges may and have been appointed for regular service on it. This nexus between the judiciary of the United States and that of Palau will continue until Palau is granted complete independence. See Palau Const., art. XV, Sec. 10, reprinted in Trust Territory Code, part V, at 440. The recent rejection of the free association compact by the people of Palau ensures that the High Court will continue to provide the general principles of law for the island for some time.
 
 
 26
 Moreover, the United States is largely responsible for the law to be applied by the Palauan courts. The High Court is required to apply the rules of American common law, and "such laws of the United States as shall, by their own force, be in effect in the Trust Territory, including the executive orders of the President and orders of the Secretary of the Interior." 1 Trust Territory Code Secs. 101, 103. The High Court has jurisdiction over maritime claims, 5 Trust Territory Code Sec. 53, and at least one judge sitting in the trial division of the High Court has held that the direction to apply the common law of the United States includes its admiralty law. Lakemba v. Milne, 4 Trust Territory Reports 44 (1968). Thus, in the underlying lawsuit brought by MIC against Bowoon in Palau, the High Court must apply the admiralty law of the United States. Moreover, although limitation proceedings are statutory, rather than common law, there is no local admiralty rule that the High Court could apply. It seems inconceivable that the Court would not apply American limitation of liability law and give full force and effect to a restraining order issued in the district court of Guam.
 
 
 27
 Thus, the situation presented here is drastically different from that presented in The Titanic. There, English descendants sued in English courts to secure the rights of English subjects and English limitation law differed substantially from the American law. Here, we are confronted with courts created by the United States and with judges, appointed by the Secretary of the Interior of the United States, who presumably will apply American limitation law. Under these circumstances, the High Court is more analogous to a district court which is subject to orders issued in conjunction with limitation proceedings than to a foreign court which is not.
 
 
 28
 MIC argues that recognizing the independence of the Palauan courts would further the development of that country's judiciary consistent with the United States obligation under the Trusteeship Agreement to foster the independence and self-government of the territory. Under the trust, however, it has always been clear that the United States would assume administrative responsibility for the island, including determining the structure of its judiciary and the law its courts would apply.
 
 
 29
 MIC argues that although the new courts will undoubtedly be influenced by American precedent, in this transitional stage Palau should be allowed to put a local gloss on that precedent. First, such a position is contrary to The Titanic and its progeny, whose holdings that limitation proceedings have no extraterritorial effect are based on the existence of independent foreign courts. Moreover, such a position is inadvisable as a matter of policy. The status of Palau has been in a state of flux over the last several years. The recent decision by the people of Palau to reject the free association compact indicates that the status of the island is uncertain and that Palau may remain closely allied to the United States for a much longer time than originally anticipated. The people may even decide to adopt a relationship with the United States other than free association. Prudence directs that we do not make a decision based on facts subject to such great change. Although Palau is moving towards independence, we hold that the courts of Palau cannot be considered "foreign" under the rationale of The Titanic and its progeny until Palau obtains a status approximating complete independence. The record before us does not demonstrate that the courts of Palau are foreign courts.
 
 
 30
 Nor is our prior precedent to the contrary. In Saipan v. United States Department of the Interior, 502 F.2d 90 (9th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975), we held that the Trust Territory government is not a federal administrative agency subject to judicial review under the Administrative Procedures Act. Id. at 94-96. In McComish v. C.I.R., 580 F.2d 1323 (9th Cir.1978), we held that the Trust Territory is not an "agency" within the meaning of section 911(a)(2) of the Internal Revenue Code. We concluded instead that the Trust Territory's government was "quasi-sovereign." Id. at 1330. To hold, however, that the Palauan courts are independent and need not honor a district court's injunction in a limitation proceeding would expand significantly the holdings of these cases and require us to designate the Trust Territory as "sovereign," not merely "quasi-sovereign." For the reasons previously stated, we decline to do so.
 
 
 31
 REVERSED.
 
 
 32
 TRASK, Circuit Judge, concurring in Parts I, II and IIIA and dissenting as to Part IIIB.
 
 
 33
 I concur in the panel's opinion, except I respectfully dissent from the part holding Palau's High Court to be subject to restraining orders issued by United States District Courts in limitation proceedings. It is my opinion that the Palauan High Court is the court of a foreign country and, therefore, not bound to apply the limitation of liability statute. Oceanic Steam Navigation Co. v. Mellor (The Titanic), 233 U.S. 718, 732-34, 34 S.Ct. 754, 755-56, 58 L.Ed. 1171 (1914); G. Gilmore & C. Black, The Law of Admiralty, 939 (2d ed. 1975).
 
 
 34
 The panel holds that the Palauan High Court is not a foreign court and therefore subject to our laws. It bases its decision on Palau's uncertain political status and also finds the result advisable "as a matter of policy."
 
 
 35
 The emphasis on Palau's political status is misplaced. Palau is part of a group of islands known as Micronesia or "little islands." Historically, it was one of the islands governed by Japan under a League of Nations mandate. In 1947, the United States entered into a trusteeship agreement with the United Nations to administer Micronesia. Under the terms of the agreement, the United States is required to
 
 
 36
 foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence, as may be appropriate to the particular circumstances of the trust territory and its peoples and the freely expressed wishes of the peoples concerned; and to this end shall give to the inhabitants of the trust territory a progressively increasing share in the administrative services in the territory; shall develop their participation in government; shall give due recognition to the customs of the inhabitants in providing a system of law for the territory; and shall take other appropriate measures toward these ends.... Trusteeship Agreement, Article 6(1) (emphasis added).
 
 
 37
 In connection with a policy review meeting in 1981, the United States announced to the Micronesian government that: (1) the United States desired to promptly move to terminate the United Nations trusteeship on terms satisfactory to itself and to the governments and peoples of Palau, the Marshall Islands and the Federated States of Micronesia; and (2) that of all the available political status options, the United States preferred the status of free association, as set forth in the initialed compact and certain additional subsidiary agreements.[1]
 
 
 38
 During the policy review meeting discussions concerning a work plan for the transition took place. As then envisioned, the procedure for the transition involved a plebiscite by the voters of Palau, the Marshall Islands and the Federated States of Micronesia under observation by the United Nations; approval by these governments according to their constitutional processes and approval by both houses of the United States Congress. Upon completion of this approval process, the United States would take up the matter of the termination of the trusteeship with the United Nations.
 
 
 39
 The plebiscite was accordingly held in 1983 and as the majority acknowledges, the citizens of Palau voted against the proposed compact of free association with the United States. This vote not only demonstrated that Palau would not blindly follow the political course desired by the United States, but also froze the United States into its contractual role of trustee and administrator. Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir.1980); People of Saipan v. United States Dep't of the Interior, 502 F.2d 90, 95 (9th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). The administrative functions carried out by the United States do not, however, vest this country with sovereignty over Palau. The courts have consistently held that the trust territory of the Pacific Islands, which includes Palau, is not within the sovereignty of the United States. See, e.g., Gale, 643 F.2d at 832; McComish v. C.I.R., 580 F.2d 1323, 1330 (9th Cir.1978); Kuhn v. United States, 541 F.Supp. 567, 568 (C.D.Cal.1982); Porter v. United States, 496 F.2d 583, 588 n. 4, 204 Ct.Cl. 355 (1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). The majority's classification of Palau as "quasi-sovereign" is, therefore, of no aid in determining whether Palau's High Court is subject to restraining orders issued by Guam's district court. "Quasi-sovereignty" in the context of Palau means no more than that the island does not carry out all its own administrative functions. Cf. Cobb v. United States, 191 F.2d 604, 607-608 (9th Cir.1951), cert. denied, 342 U.S. 913, 72 S.Ct. 360, 96 L.Ed. 683 (1952).
 
 
 40
 The majority ignores the statement by a panel of this court that "[n]umerous cases establish that the Trust Territory is a foreign country." McComish v. C.I.R., 580 F.2d at 1330. As the court of a foreign country, Palau is not bound by the restraining order of the Guam district court. The Titanic, 233 U.S. at 732-34, 34 S.Ct. at 755-56.
 
 
 41
 The exception to this rule is set out in the Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301; T.I.A.S. No. 1665 (Trusteeship Agreement). Article 3 of the Trusteeship Agreement provides that the United States "may apply to the trust territory ... such of the laws of the United States as it may deem appropriate to local conditions and requirements."
 
 
 42
 Although the High Court is required to apply American common law, 1 Trust Territory Code Sec. 103 (1980), there is no common law to apply in the case at bar. Limitation proceedings are statutory. As the Court in Andrus stated: "Congress must manifest an intent either within the statute or in the legislative history to include the Trust Territory [within the reach of a statute] for it to be covered." Id. at 834.
 
 
 43
 The majority recognizes that Congress has not extended the limitation of liability statute to Palau, but holds the statute applicable, because there is no local admiralty rule the High Court could apply. This holding is objectionable for two reasons: First, it usurps a function reserved to Congress and second, it breaches article 6(1) of the Trusteeship Agreement, which, as already noted, provides that the United States shall: "foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence...."
 
 
 44
 The majority finds it inconceivable that the High Court of Palau would apply anything but American limitation of liability law. Even assuming the accuracy of this hyperbole, the decision to apply that law lies with the High Court, not this panel. No question has been raised, as to the competency of the Palau judiciary to proceed with the litigation now before it.
 
 
 
 *
 Honorable Clement F. Haynsworth, Jr., Senior Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation
 
 
 [1]
 Because we assert jurisdiction under section 1292(a)(1), we need not decide whether jurisdiction also exists under 28 U.S.C. Sec. 1292(a)(3)
 
 
 [2]
 46 U.S.C. Sec. 183 is the critical provision of the Limitation Act and subsection (a) has remained virtually without change since it was enacted in 1851. The provision currently reads:
 The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.
 
 
 [3]
 See 28 U.S.C. Appendix--Rules of Civil Procedure, Supplemental Rules for Certain Admiralty and Maritime Claims (effective July 1, 1966), Rules A through F inclusive
 
 
 [4]
 Bowoon also argues that it is irrelevant whether Palau is an independent country because the contract for the shipment of MIC's cargo provided that the law of the United States would control both the substantive rights of the parties and limitation of liability. Even if the contract provides that United States law should apply, it does not provide a basis for enjoining MIC's Palauan litigation or compelling MIC to submit its damage claims before the district court in Guam. Unlike The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), in which the Supreme Court upheld the validity of a forum-selection clause, the contract between Bowoon and MIC does not specify that disputes involving the shipment must be litigated in any particular forum. The contract here provides only that American law determines the rights of the parties. The Palauan court may determine that the contract requires it to apply American law, but if it is a "foreign" court, it would not be subject to a district court order even though it is applying American law
 
 
 [5]
 The rule stated in The Titanic was followed for nearly forty years until the Supreme Court modified its earlier ruling in Black Diamond Steamship Corp. v. Robert Stewart & Sons, Ltd. (The Norwalk Victory), 336 U.S. 386, 69 S.Ct. 622, 93 L.Ed. 754 (1949). In The Norwalk Victory, the Court held that if the substantive rights of the litigants are governed by application of foreign law and if the foreign limitation "attaches" to those rights then the foreign limitation controls regardless of existing remedies provided under the forum's limitation laws. Id. at 395, 69 S.Ct. at 627; see In re Bethlehem Steel Corp., 435 F.Supp. 944, 947 (N.D.Ohio 1976). The Court's decision in The Norwalk Victory is inapplicable in the present case because Bowoon argues that American law, not foreign law, should be applied to determine the liability resulting from the stranding of its ship. See footnote 4 supra
 
 
 [6]
 The history and structure of the Trust Territory government established under United States administration is discussed in Gale v. Andrus, 643 F.2d 826, 828-30 (D.C.Cir.1980), and McComish v. C.I.R., 580 F.2d 1323, 1328-30 (9th Cir.1978). See also P. Manhard, The United States and Micronesia in Free Association: A Chance To Do Better? (National Security Affairs Monograph No. 79-4, June 1979)
 
 
 [7]
 The concept of "free association" derives from United Nations General Assembly Resolution 1541 (Dec. 15, 1960), which identified "free association with an independent state" as one arrangement under which a territory may develop toward self-government. Principle VII of the Resolution also provides a definition of free association status:
 (a) Free association should be the result of a free and voluntary choice by the peoples of the territory concerned expressed through informed and democratic processes. It should be one which respects the individuality and the cultural characteristics of the territory and its peoples, and retains for the peoples of the territory which is associated with an independent State the freedom to modify the status of that territory through the expression of their will by democratic means and through constitutional processes.
 (b) The associated territory should have the right to determine its internal constitution without outside interference in accordance with due constitutional processes and the freely expressed will of the people. This does not preclude consultations as appropriate or necessary under the terms of the free association agreed upon.
 G.A. Res. 1541, 15 U.N. GAOR, Supp. (No. 21) at 29-30, U.N. Doc. A/4684 (1960).
 
 
 [8]
 It was pursuant to this section that MIC's suit against Bowoon was transferred to the Supreme Court of Palau
 In determining whether the courts of Palau are "foreign," Bowoon argues that we should consider the courts as they existed before the local courts were created and before this case was transferred. We need not decide this issue because we conclude that the courts of Palau are not foreign courts even in their current state.
 
 
 [1]
 There are two other options available to Palau: commonwealth status or independence