**MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Morgan Grenfell & Co., Limited, the Bank of Tokyo, Limited, the Governor and Company of the Bank of Scotland and Orion Royal Bank, Limited, Plaintiffs,**

**v.**

**REPUBLIC OF PALAU, Defendant.**

**No. 86 Civ. 0590 (RWS).**

United States District Court,
S.D. New York.

July 10, 1986.

Jones, Day, Reavis & Pogue (Barry R. Satine, Carl F. Goodman, Robert B. Wallace, of counsel), New York City, for plaintiffs.

Susan L. Arinaga, Reboul, MacMurray, Hewitt, Maynard & Kristol (Wayne A. Cross, of counsel), New York City, for defendant.

## OPINION

SWEET, District Judge.

Plaintiffs Morgan Guaranty Trust Company of New York, Morgan Grenfell & Co., Limited, The Bank of Tokyo, Limited, The Governor and Company of the Bank of Scotland and Orion Royal Bank Limited (collectively "Banks") have moved for an order remanding this action to the Supreme Court of the State of New York pursuant to 28 U.S.C. § 1447(c) for lack of diversity jurisdiction as the Republic of Palau ("Palau") is not a foreign state within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C., §§ 1330, 1441(d) and 1603.[1] For the reasons set forth below, the motion is denied.

### Prior Proceedings

The Banks filed this action on December 17, 1985 in the Supreme Court of New York seeking to recover for an alleged $35 million default by Palau in connection with the financing of an electrical power plant on Palau. On January 21, 1986, Palau removed this action to federal court pursuant to 28 U.S.C. §§ 1441(d) and 1330 on the grounds that Palau is a "foreign state" with removal jurisdiction in the federal district court. On March 3, 1986 the Banks filed the instant motion which was orally argued on April 11, 1986.

### Background

The Banks' motion to remand this action poses a single question—whether Palau is a "foreign state" within the meaning of 28 U.S.C. §§ 1330, 1441(d) or 1603. This question requires the court briefly to outline the transitional political status of Palau as it relates to the designation of "foreign state" under these sections. The parties have no conflict as to facts relating to the status of Palau, although they differ strenuously as to the conclusion to be derived from these facts.

Between World Wars I and II, the islands and atolls comprising Micronesia including Palau, were governed by Japan pursuant to a League of Nations Mandate. In 1947 the United States and United Nations Security Council entered into a Trusteeship Agreement which designated Palau as a "strategic trust" to be administered by the United States as part of the Trust Territory of the Pacific Islands. *See* Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat 3301; T.I.A.S. No. 1665 (hereinafter "Trusteeship Agreement"). The Trust Territory included the administrative districts of Kosrae, Yap, Palau, Ponape, the Marshall Islands and Truk.[2] The Trusteeship

---

1. Section 1603 provides in relevant part:
   "For purposes of this chapter—
   (a) A "foreign state," except as used in section 1608 of this title, includes political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
   (b) An "agency or instrumentality of a foreign state" means any entity—
   (1) which is a separate legal person, corporate or otherwise, and
   (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
   (3) which is neither a citizen of a state of the United States as defined in Section 1332(c) and (d) of this title nor created under the laws of any third country.
   (c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

2. The Republic of Palau is an archipelago of Islands known as the Carolines which lies approximately seven degrees north of the equator and 600 miles east of the Phillipines. The Islands are also approximately 600 miles north of

Agreement vests the United States with administrative, legislative and judicial authority over the Trust Territories and requires the United States in Article 6(1) to "foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self government or independence ..."

While the United Nations Trusteeship Council and the United Nations Security Council retained oversight of the Islands, the direct administrative authority over the Trust Territories was delegated by the United States Congress to the President and ultimately to the Department of the Interior. Exec. Order No. 11021, 27 Fed. Reg. 4409 (May 9, 1962). In 1968 the Secretary of the Interior established a local government for the Trust Territories (Secretarial Order 2918, 34 Fed.Reg. 157 (Dec. 27, 1968)) with executive power vested in a "High Commissioner" of the Executive Branch appointed by the President with advice and consent of the Senate, 2 Trust Territory Code 351, Vo. 1 (1980 ed.), 48 U.S.C. § 1681(a). The High Commissioner has the authority to appoint officials to the executive offices of the Trust Territory and may submit proposed legislation to the Congress.

Order 2918 also established a local legislative branch or Congress of Micronesia consisting of a Senate and House of Representatives with the circumscribed authority to pass laws which are consistent with treaties or international agreements of the United States, laws of the United States expressly applicable to the Territory, Executive Orders, or Orders of the Department of the Interior. Every bill passed by the Congress can be vetoed by the High Commissioner and, if overridden by a two-thirds majority of the membership of both Houses, can be vetoed by the Secretary of the Interior. Order No. 2918, pt. III, § 13. For a complete discussion of the structure of the trust territory government, *see Gale v. Andrus*, 643 F.2d 826 (D.C.Cir.1980);

*People of Saipan v. United States Dept. of Interior*, 356 F.Supp. 645 (D.Hawaii 1973). Palau's designation as a "strategic trust" also grants the United States preferential treatment in economic and commercial relations with Palau, as well as granting the right to close-off portions of the Trust Territory or bar persons from the area, including the United Nations. *Id.* at 654, Trusteeship Agreement, Article I.

Over the past fifteen years Palau has moved towards independence with the goal of ending the trusteeship rule of the territory, as have several other Pacific Trust Territory Islands. Pursuant to the Secretary of Interior Order No. 3039, 44 Fed. Reg. 28116 (May 14, 1979) entitled "Recognition of Governmental Entities under Locally-Ratified Constitutions in the Trust Territory of the Pacific Islands," Palau adopted a constitutional form of government, which became effective on January 1, 1981. The constitution provides for an executive branch with a popularly elected president and vice president, a bicameral legislature, the Olbiil Era Kelulau (the "OEK") comprised of a Senate and House of Delegates, and a unified judiciary.

Exercising its constitutional mechanisms, Palau has demonstrated attributes of sovereignty both before and after adopting the Compact. The declaration of Eric S. Basse, Assistant Attorney General of Palau, establishes that Palau has negotiated commercial and diplomatic treaties and agreements with several nations on a government-to-government basis, primarily concerning the management of Pacific Island Fisheries, but also concerning environmental protection treaties and grant agreements with foreign nations. Also pursuant to the constitution adopted in 1981, Palau has joined several international organizations in its own right, including the South Pacific Commission and the Forum Fisheries Agency. Palau has also created a national postal system, and has a national flag. Under its constitution, it has jurisdiction over bankruptcies, admission and ex-

the nearest point in New Guinea. U.N.TCOR at

36, U.N.Doc. T/1878 (1985).

clusion of aliens, patents, copyrights and public lands.

The second drive of this twofold path towards independence has been the establishment of a relationship of independent "free association" with the United States, as defined in United Nations General Assembly Resolution 1541 (Dec. 5, 1960), 15 U.N.GAOR Supp. (No. 21), U.N.Doc. A/4684 (1960), whereby Palauans would exercise their own sovereignty and would not become United States citizens. *See Matter of Bowoon Sangsa Co., Ltd.*, 720 F.2d 595, 600 (9th Cir.1983). On January 10, 1986, Palau and the United States signed a Final Compact of Free Association (the "Compact") which was ratified in a Palauan plebiscite on February 24, 1986. The terms of the Compact establish Palau's independent sovereignty and equal diplomatic status in the international community. The Compact must be approved by the President of the United States and both Houses of the United States Congress, and the United Nations must consent to modify or eliminate the Trusteeship Agreement.

## Discussion

On January 21, 1986 Palau removed this action from New York State to Federal District Court in reliance upon portions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, and 1441(d) governing removal of actions to the federal court. Section 1330(a) governing original jurisdiction provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

Section 1441(d) governing removal for the same grounds also incorporates section 1603(a) as the definitional referent for removal jurisdiction under these sections:

> Any civil action brought in a state court against a foreign state as defined in sec-

tion 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury.

28 U.S.C. § 1441(d).

The parties dispute whether the Republic of Palau is a "foreign state" entitled to original or removal jurisdiction in a federal forum. According to the Banks, Palau's status as a Trust Territory of the Pacific Islands deprives it of the status of "foreign state" until the termination of the Trusteeship Agreement. Several federal courts have upheld this view of Palau's political status in various statutory contexts, concluding that the United States so limited the authority of Palauan local government that Palau was "functionally governed" by the United States. In *World Communications Corp. v. Micronesian Telecommunications Corp.*, 456 F.Supp. 1122 (D.Hawaii, 1978), a Hawaii corporation and citizen brought an action against a corporation organized under the Trust Territory of the Pacific Islands, basing jurisdiction on the diverse citizenship of the parties. Dismissing the action for lack of jurisdiction, the court concluded:

> Plaintiffs contend that the Trust Territory was a "foreign state" within the meaning of 28 U.S.C. § 1332(a). This court has previously rejected the characterization of the Trust Territory as a foreign country in *People of Saipan, supra* ... In light of similar considerations, I now hold that the Trust Territory is not a "foreign state" within the meaning of 28 U.S.C. § 1332.

*Id.* at 1124.

The district court of Hawaii arrived at the same conclusion five years earlier in *People of Saipan v. United States Department of Interior, supra,* 356 F.Supp. 645 (D.Hawaii, 1973) relied upon by the court in *World Communications, supra.* In *People of Saipan*, the court held, *inter alia*, that the Trust Territory government is not immune from suits in the United States

Courts on the theory that it is a "foreign country":

> Upon consideration of all of the above, it is my opinion that the United States exercises a maximum degree of control which is inconsistent with the assertion that the Trust Territory is a foreign country. My decision is reinforced by the fact that there does not appear to have been any significant delegation of authority to the citizens of the Trust Territory. The United States acting through the Secretary of the Interior controls the High Commissioner and retains an absolute veto over all legislation enacted by the Congress of Micronesia. Accordingly, without determining exactly what status the Trust Territory occupies, I hold that it is not a foreign country entitled to immunity from suits in United States courts.

*Id.* at 656.

Similarly, in *Sablan Construction Corp. v. Government of Trust Territory*, 526 F.Supp. 135 (D.N.Mar.I., App.Div.1981) the district court held that the Trust Territory of the Pacific Islands was not a "foreign country" under the Foreign Sovereign Immunities Act and is not immune from federal court jurisdiction.

Most recently in *Matter of Bowoon Sangsa, supra,* 720 F.2d 595 (9th Cir.1983), the Ninth Circuit rejected the notion that the adoption of the Constitution rendered Palau an independent sovereign. Holding that Palauan courts are not "foreign courts" and must honor an injunction issued by a United States federal district court, the Ninth Circuit observed:

> Although Palau is moving towards independence, we hold that the courts of Palau cannot be considered "foreign" under the rationale of The Titanic [233 U.S. 732] and its progeny until Palau obtains a status approximating complete independence.... To hold, however, that the Palauan courts are independent and need not honor a district court's injunction in a limitation proceeding would expand significantly the holdings of these cases and require us to designate the Trust Territo-

ry as a "sovereign" not merely "quasi sovereign."

*Id.* at 602.

While these four precedents shed light on the complexity of the issue before the court, they do not, contrary to the Banks' assertions, necessarily determine the question of whether the current political autonomy of Palau renders it a "foreign state" within the meaning of the Foreign Sovereign Immunities Act ("FSIA"). First, in both *World Communications, supra* and *People of Saipan, supra* the courts dealt solely with the status of the Trust Territory Government as it existed in 1978 and 1973 respectively, prior to the alteration in the Trusteeship Agreement as it pertained to several Micronesian nations. Furthermore, neither opinion discusses the concepts of sovereignty in the Foreign Sovereign Immunities Act, as *World Communications* concerned diversity jurisdiction under 28 U.S.C. § 1332 and *People of Saipan* concerned sovereign immunity concepts prior to the enactment of the FSIA.

The two cases most relevant to the present inquiry are *Sablan Construction Corp. v. Government of Trust Territory, supra,* 526 F.Supp. 135 (D.N.Mar.I.1981) and *Matter of Bowoon Sangsa, supra,* 720 F.2d 595 (9th Cir.1983). *Sablan* is significant because it confronts the issue of the status of the Trust Territories generally under the FSIA. Relying on *People of Saipan, supra* as controlling precedent, the court held that the Trust Territory of the Pacific Islands is not a "foreign state" within the meaning of the FSIA:

> The passage of the Foreign Soverign Immunities Act did not alter the rule enunciated in *People of Saipan.* Section 1603(c) distinguishes the "United States" from an immune "foreign state" by defining the "United States" to include "all territory and waters, continental or insular, subject to the jurisdiction of the United States." Under Article 3 of the Trusteeship Agreement the Trust Territory is subject to the jurisdiction of the United States. For purposes of the Act, the Trust Territory is part of the United

States rather than a foreign state. The Act thus underscores and supports the holding in People of Saipan that the Trust Territory is not a foreign country immune from federal court jurisdiction.

*Id.* at 138 (footnotes omitted).

The *Sablan* court thus rested squarely on *People of Saipan* with a brief discourse on the attributes of sovereignty which existed at the time of the *People of Saipan* decision in 1973:

At most the Trust Territory has "quasi-sovereignty," which courts also describe interchangeably; more frequently and more precisely as "qualified sovereignty." This qualified sovereignty is the right to exercise local government authority delegated by the United States Congress pursuant to its legislative powers under the Trusteeship Agreement. *People of Saipan,* 356 F.Supp. at 658–659; *Calvo v. Trust Territory,* 4 T.T.R. 506, 511–12 (H.C.App.Div.1969) ... In certain administrative and governmental roles the Trust Territory is a distinct legal entity. Nevertheless it is not in every substantial sense an independent international entity. *World Communications v. MTC,* 456 F.Supp. 1122, 1124 (D.Haw.1978).

*Id.* at 140–141 (footnotes omitted).

As this passage illustrates, although the *Sablan* court recognized that concepts of sovereignty were fluid and involved determinations by degree of administrative autonomy, it did not engage in such a determination of the status of an individual Micronesian nation, as it was concerned with federal court jurisdiction over tax refund actions against the Trust Territory Government in general.

In contrast, the Ninth Circuit in *Matter of Bowoon Sangsa* specifically examined the current political status in Palau to determine whether the judiciary of Palau was sufficiently subject to judicial review by United States courts to render such courts amenable to injunctions by a United States district court:

MIC argues that in view of the largely independent status of Palau and the increasingly limited role of the United States as trustee for the territory, the courts of Palau are not subject to orders issued in conjunction with limitation proceedings brought in American courts. We disagree. The recent movement toward independence masks the extent to which the courts of Palau are still dominated by the United States. The High Court, which continues to establish the law of the island through exercise of its appellate jurisdiction, has a substantial American flavor. Its justices are appointed by the Secretary of the Interior. Regular Article III Judges and territorial judges may and have been appointed for regular service on it. This nexus between the judiciary of the United States and that of Palau will continue until Palau is granted complete independence ... The recent rejection of the free association compact by the People of Palau ensures that the high court will continue to provide the general principles of law for the island for some time.

*Id.* at 601 (citations omitted).

The *Bowoon* court made no determination of whether Palau, viewed as a governmental entity moving toward independence, possessed attributes of sovereignty to entitle it to "foreign state" status under the FSIA. The Ninth Circuit had to determine the existence one attribute of sovereignty which Palau did not yet possess, namely a judiciary completely independent from oversight by United States courts, a determination which does not preclude this court's examination of the larger question of whether Palau now possesses enough of the other (and perhaps collectively more significant) attributes of sovereignty to be considered a "foreign state." Although the *Sablan* court had the FSIA issue before it in 1981, it discussed only the structure of Trusteeship Governance in general and did not address Palau in particular. Furthermore, the *Sablan* court relied on *People of Saipan,* a 1973 decision, as "controlling precedent" on the issue of Trust Territory sovereignty, without delving into

the larger questions of *de facto* statehood in the context of burgeoning independence.

The provisions of FSIA shed no light on the nature of this elusive concept of "foreign state" under the Act itself, *see supra* note 1. However, courts have wrestled with sovereignty concepts more generally from the inception of American jurisprudence. The Supreme Court has often attempted to define sovereignty by listing its attributes, or the powers which indicate that a nation is recognized as foreign and independent. For example in *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 318–319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) the court listed the following indicia of sovereign statehood; the power to declare and wage war; to conclude peace; to maintain diplomatic ties with other sovereigns, to acquire territory by discovery and occupation, and to make international agreements and treaties. The power to exclude or expel aliens is also a recognized prerogative of a sovereign nation, *Chae Chan Ping v. United States,* ("The Chinese Exclusion Case"), 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889) as are the more general administrative tasks of self-governance such as regulation of coinage systems, patents and copyrights and postal services. *Id.* at 586, 9 S.Ct. 623, and the selection of a flag or other national symbol. *United States v. Ferguson,* 302 F.Supp. 1111 (N.D.Cal.1969).

The Banks contend that an analysis of foreign statehood for purposes of the FSIA should be narrowly construed to consider only the status of Palau as of the moment the complaint was filed which was less than two months prior to the adoption of the Compact,[3] and to approach the question

of sovereignty from the point of view of the *de jure* theoretical limits which the existence of the Trusteeship places on Palau's independence. This court rejects both propositions.

First, the Banks are correct that jurisdictional questions are generally determined as of the date upon which the complaint was filed, in this instance December 17, 1985. *Louisville, N.A. & C Ry. Co. v. Louisville Trust Co.,* 174 U.S. 552, 566, 19 S.Ct. 817, 822, 43 L.Ed. 1081 (1899); *World Communications Corp. v. Micronesian Telecommunications Corp., supra,* 456 F.Supp. at 1125. However, the courts of the United States have long recognized that sovereignty is an ephemeral concept, which in this court's view if not susceptible to reduction into a jurisdictional "moment".[4] As Justice Frankfurter observed:

> To assume that terms like "foreign country" and "possessions" are self-defining, not at all involving a choice of judicial judgment, is mechanical jurisprudence at its best. These terms do not have fixed and inclusive meanings, as is true of mathematical and other scientific terms. Both "possessions" and "foreign country" have penumbral meanings, which is not true, for instance, of the verbal designations for weights and measures.

*United States v. Spelar,* 338 U.S. 217, 223, 70 S.Ct. 10, 13, 94 L.Ed. 3 (1949) (Frankfurter, J. concurring). *See also Hichino Uyeno v. Acheson,* 96 F.Supp. 510 (W.D. Wash.1951) (holding that Japan was a "foreign state" during its military occupation by the United States). As sovereignty is "legal shorthand for legal personality of a

---

3. Although the Compact was finally ratified by Palauan plebescite on February 24, 1986, it was approved by the Palauan people as early as February 10, 1983 when they voted to approve Free Association status. The Compact did not take effect in 1983 because the Palauans would not agree to a separate collateral agreement concerning the introduction of nuclear weapons onto the Island. *See* Armstrong & Hills, *The Negotiations For the Future Political Status of Micronesia* (1980–1984), 78 Am.J.Int'l L. 484, 492 (1984).

4. Assuming *arguendo* that the court should view Palau's indicia of independence as of December 17, 1985, the declaration of Eric S. Basse, Assistant Attorney General of Palau, demonstrates that the sovereign initiatives set forth above were undertaken pursuant to Palau's adoption of its constitution on January 1, 1981 and not in anticipation of the ratification of the Compact of Free Association on February 24, 1986.

certain kind, that of statehood,"[5] it would be the ultimate formalism to ignore the existence of a Compact approximately fifteen years in the preparation and negotiation phase because the complaint was filed less than two months prior to its ratification by plebescite.

Second, the Banks' approach to the weighing of sovereign attributes is also "mechanical jurisprudence" as it requires the court to close its eyes to the *de facto* degree of sovereignty which the Palauans have exercised since the adoption of the Constitution and the Compact, in favor of examining only the literal language of the Trusteeship Agreement. This is not to dispute the continued existence of the Trusteeship Agreement which provides that the administrative power over Palau resides in the Trustee. So long as the Agreement remains in place, the Department of the Interior acting through the High Commissioner retains the nominal power to screen budgets, conduct audits and process federal aid grants for the executive branch, and retains the power in certain circumstances to suspend laws approved by the Congress of Palau. The Interior Secretary still appoints the Justices of the High Court of Palau. However, this *de jure* approach eclipses the new political relationship which the Compact has established between the United States and Palau; a *de facto* relationship which is carrying Palau forward to free association before the structure of the old Trusteeship is dismantled.

Federal courts have often used concepts of *de facto* sovereignty to evaluate their jurisdiction over nations in political transition. In *Murarka v. Bachrack Brothers*, 215 F.2d 547 (2d Cir.1954) the Second Circuit faced a suit between a New York corporation and a citizen of India. When the complaint was filed, India was governed by an interim government between British rule and independence, and was one month shy of complete independence on August 15, 1947. The Court observed, "True, as of July 14, 1947 our government had not yet given India *De Jure* recognition, but its exchange of ambassadors in February and April 1947 certainly amounted at least to a de facto recognition if not more.[6] To all intents and purposes, these acts constituted a full recognition of the Interim government of India at a time when India's ties with Great Britain were in the process of withering away ..." *Id.* at 552.

Similarly, in *Betancourt v. Mutual Preserve Fund Life Association*, 101 F. 305 (C.C.S.D.N.Y.1900) the district court found diversity of citizenship between a New York corporation and a Cuban citizen, although Cuba was at the time occupied by the United States in the aftermath of the Spanish-American War.[7] The court noted that the United States and Spain had signed a treaty whereby Spain relinquished all claims of sovereignty over Cuba, the United States occupied the island and agreed to protect life and property in Cuba from the unexpected consequences of the occupation, and Spanish subjects on the island who failed to declare their Spanish citizenship would be deemed to have adopted "the nationality of the territory in which they may reside." *Id.* at 305–306.

An examination of the recent developments in Palau's political structure reveals that it has embarked on a relationship of Free Association with the United States

---

**5.** Ian Brownlie, *Principles of Public International Law*, p. 110 (3rd Ed.1979).

**6.** It is notable in this regard that the United States recognized the diplomatic credentials of Palau's President Lazarus E. Salii when he served as Palau's Ambassador for Status Negotiations and Trade Relations, and accorded President Salii's United States counterpart, Fred M. Zeder II, Ambassadorial status. *See* Declaration of Eric S. Basse, April 7, 1986 at ¶ 10.

**7.** While the district court in *World Communications Corp. v. Micronesian Telecommunications Corp*, 456 F.Supp. 1122, (D.Hawaii, 1978) dismissed similar *de facto* sovereignty arguments based upon the *Murarka* and *Betancourt* decisions, the court did so with the realization that it had to evaluate the degree of independence exercised by the Trust Territory government. *Id.* at 1124 (the trust territory was not in every substantial sense an independent international entity).

and has exercised a degree of independence which surpasses the examples of *de facto* foreign statehood in *Murarka* and *Betancourt:*

> In this context it is interesting to note that there are two fundamental differences between the Trusteeship Agreement and the compact. First, the Trusteeship Agreement is between the United States and the Security Council and provides for United Nations functions in relation to administration of the trusteeship, while the Compact—which will provide the basis for terminating the United Nations role—is directly between the peoples of the islands exercising their sovereignty through their constitutional governments. Secondly, the Trusteeship Agreement can be terminated only with the agreement of the United States, while the Compact can be terminated in accordance with terms mutually agreed upon and set forth in the provisions of the Compact and its related agreements.

Hills, *Compact of Free Association for Micronesia: Constitutional and International Law Issues,* 18 Int'l Law. 583, 600 (1984).

With the adoption of its Constitution and Compact, Palau has reactivated a sovereignty which had been dormant. "From the beginning, the United States has recognized that its own interests and the interests of the Pacific Basin were intrinsically dependent on preserving access to U.S. forces to Micronesia for occasional or emergency use and preventing the intrusion of foreign military forces into the area." *"From the beginning, the Trust Territory also enjoyed a unique status because its sovereignty was reserved in political trust while the foundation for development was laid."* Armstrong & Hills, *The Negotiation for the Future Political Status of Micronesia (1980–1984)* 78 Am.J. Int'l L. 484, 497 (1984) (emphasis added). The terms of the Compact itself confirm that the foundation laying period has ended and the transition to sovereign equality has begun. Article I, Section 111 proclaims "The People of Palau, acting through their duly elected government established under their constitution, are self-governing," and Article II, Section 125 goes on to specify that "Except as otherwise provided in this compact or its related agreements, all obligations responsibilities, rights and benefits of the Government of the United States as administering authority which has resulted from the application pursuant to the Trusteeship agreement or any treaty or other international agreement to the trust Territory of the Pacific Islands on the day preceding the effective date of this compact are no longer assumed and enjoyed by the Government of the United States." This "effective date" is defined in Title IV, Article 1, Section 411, which provides:

> This compact shall come into effect upon mutual agreement between the Government of the United States, acting in fulfillment of its responsibilities as Administering Authority of the Trust Territory of the Pacific Islands, and the Government of Palau, subsequent to the completion of the following:
>
> (a) Approval by the Government of Palau in accordance with its constitutional processes;
>
> (b) Approval by the People of Palau in a referendum called on this compact;
>
> (c) Approval by the Government of the United States in accordance with its Constitutional processes.

Thus the Compact launches the United States and Palau upon a course of intimate association without mention of the approval of the United Nations Security Council within the confines of the Compact. The Compact assumes that the Trusteeship is effectively, if not actually, dissolved because the United States has exchanged its Administering Authority "hat" for a consensual relationship with Palau, and Palau has mustered its Constitutional forces to end its dependent status. *See* Comment *International Law and Dependent Territories: The Case of Micronesia,* 50 Temp. L.Q. 58, 60 (1976) ("Implicit in the concept of the dependent territory is a recognition that this status is temporary. A territory is to remain under international supervision only until it chooses, by an act of self-deter-

mination, a more permanent status." *citing* G.A.Res. 1514, 15 U.N.GAOR Supp. 16, at 66, U.N.Doc. A/4684 (1960).

While the Banks argue that the obstacles of joint congressional resolution and United Nations approval are substantial barriers to the effectiveness of the Compact, Congress has already terminated the trusteeship of the Marshall Islands and the Federated States of Micronesia by approving the Compacts for both nations in January, 1986. No reason has been advanced to suggest that the Compact will receive different treatment. As Howard Loomis Hills, legal counsel to the President's Personal Representative for Micronesian Status Negotiations, has noted, there is a high degree of bipartisan interest in and support for the Compact in both Houses of Congress due in part to the fact that the Compact was negotiated by representatives from both the Carter and Reagan administrations. Hills, *Compact of Free Association for Micronesia: Constitutional and International Law Issues, supra,* p. 586 at n. 14.

Similarly, the notion that United Nations approval is an isolated final step in the termination of the Trusteeship Agreement misconstrues the historical context of the Trusteeship's development, the role of the United States as Administering Authority and the power which the United States has reserved with respect to its participation in the structure.

First, the United States disclaimed sovereignty over Palau from the inception of the Trusteeship. Indeed, in the drafting of Article 3 of the Trusteeship Agreement which provides that the administering authority has "full powers of administration, legislation and jurisdiction over the territory subject to the provisions of this agreement ...," the words "as an integral part of the United States" which appeared in an earlier draft were deleted to negate any impression that the United States was claiming sovereignty. Hills, *Compact of Free Association for Micronesia, supra,* at 590. In this regard, Professor Brownlie has noted the discussion of Judge McNair

in *International Status of South West Africa,* I.C.J. Reports (1950) as an apt description of the "derogation" of sovereignty caused by the creation of the mandate and trusteeship systems:

> Sovereignty over a Mandated Territory is in abeyance; if and when the inhabitants of the Territory obtain recognition as an independent state ... sovereignty will revive and rest in the new State. What matters ... is not where sovereignty lies, but what are the rights and duties of the Mandatory in regard to the Territory being administered by it ... Its essence is that the Mandatory acquires only a limited title to the territory entrusted to it, and that the measure of its powers is what is necessary for the purpose of carrying out the Mandate.

Ian Brownlie, *Principles of Public International Law,* p. 182 (3rd Ed.1979).

Second, to construe the United States as a cog in the independent machine of the Trusteeship is to misconstrue the United States' role in the creation of the system and its necessary participation as Administering Authority. The general Trusteeship System was incorporated into the United Nations Charter, Articles 73–91. However, the United States, recognizing the strategic importance of the islands formerly under Japanese mandate, proposed a unique status for Micronesia, that of a "strategic trust" which would be administered by the Security Council rather than the General Assembly. United Nations Charter, Articles 82, 83. Hills, *Compact of Free Association for Micronesia, supra* at 589.

> The lack of a peace treaty with Japan underscores the fact that the United States acquired no claim of sovereignty over the islands by virtue of its post war occupation. In this light, the full authority over the islands which the United States would acquire under the Trusteeship Agreement presented a convenient and legitimate means of protecting our national security interests and enabling this country to assume effective control over the islands in a manner consistent with United States policy and internation-

al law. Article 15, of the proposed Agreement, pursuant to which the terms may not be altered or terminated without United States' consent seemed to ensure that the United States position in the islands would not change until we desired that it should.

*Id.* at 592 (footnotes omitted).

Article 15 of the Trusteeship Agreement referred to above provides that "the terms of the present agreement shall not be altered, amended or terminated without the consent of the administering authority", a reserved power which, when combined with the United States' power to veto any adverse Security Council's action with regard to the Trusteeship, illustrates the error in placing exaggerated weight on the vestigial trusteeship structure once the United States has altered its role as Administering Authority in favor of a new relationship of Free Association with Palau. *See* Armstrong & Hills: *The Negotiations for the Future Political Status of Micronesia (1980–1984), supra,* at 496 ("The 1947 Trusteeship agreement prescribes no procedures for its own termination, and there is no real precedent in United Nations practice because this is the only strategic trusteeship ever established.")

Viewed in the proper historical context, it appears that although the dismantling of the structure of the trusteeship can be accomplished only with United Nations' approval, Palau's *de facto* political independence demonstrates that the United States and Palau are embarking on a consensual relationship external to the Trusteeship, while the dissolution of the Trusteeship lags behind. Borrowing from the Second Circuit's observations in *Murarka*, "Unless form rather than substance is to govern, we think that in every substantial sense by the time this complaint was filed [Palau] had become an independent international entity and was so recognized by the United States."

Recognizing Palau as a foreign state also comports with the policies behind the Foreign Sovereign Immunities Act. The legislative history of the Act demonstrates that federal court jurisdiction was intended to ensure uniformity of decision in the interests of foreign relations. In discussing sections 1330 and 1441(d) of the Act, the House report states:

Section 1330 provides a comprehensive jurisdictional scheme in cases involving foreign states. Such broad jurisdiction in the federal courts should be conducive to uniformity in decision, which is desireable since a disparate treatment of cases involving foreign governments may have adverse foreign consequences.... In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is important to give foreign states clear authority to remove to a federal forum actions brought against them in the state courts.

H.R.Rep. No. 94–1487, 94th Cong., 2nd Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6611, 6631. The House Report stresses "the bill's preference that actions involving foreign states be tried in federal courts." *Id.*

In short, Palau has been exercising sovereign powers pursuant to its Constitution adopted in January, 1981, and possesses the attributes of sovereignty which entitle it to the status of "foreign state" pursuant to 28 U.S.C. § 1330, 1441(d). The United States and Palau have commenced a new era of Free Association which effectively terminates the Trusteeship regime, triggering the need to accord Palau the dignity of an equal sovereign and implicating the uniformity and sensitivity goals behind the FSIA. The concept of *"de facto"* sovereignty, of course, presumes that some further acts are required before complete unfettered sovereignty can be claimed. To ignore Palau's exercise of substantial sovereignty and the effective disintegration of the Trusteeship in favor of formalist indicia of international independence would defeat the concept of *de facto* sovereignty. The Banks' motion for a remand to the Supreme Court of the State of New York is denied.

**IT IS SO ORDERED.**