**MURARKA et al.**

v.

**BACHRACK BROS., Inc.**

No. 262, Docket 22960.

United States Court of Appeals, Second Circuit.

Argued June 15, 16, 1954.

Decided Aug. 3, 1954.

Clarence P. Greer, New York City (Morris Einhorn, New York City, and Harold L. Flint, Great Neck, N. Y., on the brief), for plaintiffs-appellees-appellants, R. Murarka, R. F. Murarka, Kasturi Bai, C. R. Agarwal, Mahanlal and Fatehchand, d/b/a Fatehchand Madangopol.

Benjamin Adler, New York City, for defendant - appellant - appellee, Bachrack Bros., Inc.

Before SWAN, MEDINA and HAR-LAN, Circuit Judges.

HARLAN, Circuit Judge.

The District Court in an action tried without a jury has held the defendant liable for breach of contract in the amount of $46,500, together with interest. The plaintiffs appeal, contending that the Court applied the wrong rule of damages and that their recovery should have been greater. The defendant cross appeals, arguing that the Court had no jurisdiction of the action, and that in any event it was not guilty of breach because of the plaintiffs' failure to perform their obligations under the contract.

The facts surrounding the transaction, as found by the District Court are essentially these: On December 23, 1946 the plaintiffs, a partnership doing business in Delhi, India, contracted to purchase from the defendant, a New York corporation, 10,000 war surplus cargo rayon parachutes at $7.00 each, plus a commission for plaintiffs' purchasing agent of 35 cents on each chute. The parachutes were to be shipped by steamer from New York and were deliverable

F.A.S. dockside New York upon receipt from the plaintiffs of irrevocable letters of credit covering the purchase price, freight, and insurance.

On January 7 and 8, 1947 two letters of credit, one for $64,000 and the other for $30,000, expiring February 10, 1947, were duly furnished by plaintiffs. On February 5, the defendant notified the plaintiffs that space had been procured for shipment of the parachutes on the "Steel Advocate" sailing February 15, 1947, and requested extension of the letters of credit for another 30 days. Actually the plaintiffs on February 3 had already set in motion extensions to February 28, which the defendant accepted, informing the plaintiffs that the parachutes would be shipped by the SS "Steel Director" on February 24.

Following this, the defendant's shipping agents put in process the necessary papers for shipping the parachutes on the SS "Steel Director" to the plaintiffs at Delhi, via Karachi. However, on February 25 the defendant, without notice to the plaintiffs, sold the parachutes to another Indian concern at an advanced price, and shipped them to that concern, via Bombay, on the "Steel Director," whose sailing date had been postponed to March 2. On March 4 the defendant received from plaintiffs' New York bank an extension of the $64,000 letter of credit to March 15, which the defendant returned to the plaintiffs on March 5.

On these facts the Trial Court found that the defendant had breached its contract, and that the only question was one of damages. The defendant seeks to avoid the consequences of what it did on two grounds which we shall consider be-

fore coming to the plaintiffs' contention that they were entitled to larger damages.

The first ground is that the District Court had no jurisdiction of the action under 62 Stat. 930, 28 U.S.C.A. § 1332(a) (2) giving the Federal Courts jurisdiction over civil actions between "Citizens of a State, and foreign states or citizens or subjects thereof", where the jurisdictional minimum amount is involved, since there was a failure of proof that the plaintiffs were "citizens or subjects" of a foreign state.

Initially the complaint, which was filed on July 14, 1947, alleged, and the plaintiffs sought to prove, merely that each of them was "an alien and a subject of Great Britain," and the District Court on December 1, 1952, dismissed the complaint without prejudice, for failure of such proof. Thereafter, on December 29, 1952, the Court granted the plaintiffs' motion to reopen the case on the issue of jurisdiction, and on January 14, 1953, after the taking of additional evidence, the Court granted plaintiffs' motion to amend their complaint so as to allege that "each plaintiff is an alien and a British Indian citizen." After a trial on the merits in October 1953, the Court found that "each plaintiff was an alien, British Indian citizen *and subject of Great Britain.*" [1]

It is not altogether clear whether the finding that each plaintiff was a "British Indian citizen" was regarded by the Court as an alternative basis for jurisdiction, rather than merely the foundation for the finding that each was a "subject of Great Britain." [2] Be that as it may, the status of India at the time the

---

1. Italics throughout this opinion have been supplied.

2. Favoring the view that the Court intended "British Indian citizen" as affording an independent ground of jurisdiction—i. e., that the plaintiffs were citizens of what was formerly known as British India—is the fact that plaintiffs' counsel after first proposing to amend the complaint so as to allege that "each plaintiff is an alien *and* a Britain [sic]

Indian citizen *and* a subject of Great Britain," then stated that he wished to "omit the words, 'and a subject of Great Britain'; because I am not sure of that status." And further, the Trial Court found: "At the time the complaint was filed the Government of India was an interim one *recognized as such by the United States* with an ambassador to Washington whose credentials were signed by His Majesty, King George the Sixth of the United Kingdom."

complaint was filed (July 14, 1947), and certainly at the time of the amendment of the complaint (January 14, 1953), was such that in our opinion, the finding that each plaintiff was a "British Indian citizen," if supported by the evidence, was a fully adequate basis for jurisdiction, even though in our view the evidence did not warrant the finding that each plaintiff was a "subject of Great Britain." As to the latter finding, it is sufficient to say that British law was neither pleaded nor proved, see Chicago Pneumatic Tool Co. v. Ziegler, 3 Cir., 1945, 151 F.2d 784, 793; United States ex rel. Zdunic v. Uhl, 2 Cir., 1943, 137 F.2d 858, 861; Iafrate v. Compagnie Generale Transatlantique, D. C.S.D.N.Y.1952, 106 F.Supp. 619, 622, that satisfactory evidence of the place of birth of the several plaintiffs was lacking, and that no other evidence that any of the plaintiffs was a British subject as a result of naturalization or otherwise was offered at the trial.[3]

■ Our first inquiry must be as to the status of India at the time of the filing of the complaint and thereafter. We may take judicial notice of the essential historical facts. The long standing aspirations of both Hindus and Moslems in India to achieve political independence from Great Britain—seriously embarrassed by the internal divisions between them—are a matter of common knowledge. Following the end of World War II, the British Government made various efforts to bring the contending factions together. The report of the Cabinet (Cripps) Mission issued on May 16, 1946, recommended the formation of an interim government to work out a constitution acceptable to both major political parties, looking toward the political separation of India from Great Britain. An Interim Government was formed on September 2, 1946. By February 20, 1947, it was apparent that the Interim Government was failing to achieve the hoped for unity between Hindus and Moslems, but the British Government nevertheless on that date announced its firm intention to transfer power to some Indian authority by June 1948. See Statement on Indian Policy delivered February 20, 1947, to Parliament by the Prime Minister.

The continued refusal of the Moslem political leaders to participate in the effort of the Constituent Assembly to draft a constitution led to the announcement by the British Government on June 3, 1947, that the Moslem areas of India would be given an opportunity to determine, by referendum, whether they would participate in the labors of the Assembly or whether they would work out their own constitution and become an independent nation separate from the rest of India. See Statement of Indian Policy delivered June 3, 1947, to Parliament by the Prime Minister.

Finally, on July 18, 1947, the British Parliament enacted the Indian Independence Act (10 & 11 Geo. VI, c. 30, Public General Acts of 1947, Vol. 1, p. 236) under which power would be transferred to two new Dominions—Pakistan (Moslem) and the Union of India (Hindu), which included Delhi where the plaintiffs were engaged in business—on August 15, 1947. On that date the Union of India became a self-governing member of the British Commonwealth of Nations. On November 26, 1949, the Union of India adopted a Constitution, effective January 26, 1950, under which it became a sovereign republic, but elected to continue as a member of the Commonwealth of Nations.

---

**3.** See British Nationality and Status of Aliens Act, 1914 (4 & 5 Geo. V, c. 17), 18 Chitty's Statutes, p. 9 (6th ed., 1914–1916), as amended in 1918, 1922, 1933 and 1943; for the status of subjects of the native Indian rulers, as distinguished from citizens of British India, see Jones, British Nationality Law and Practice, pp. 274, f. n. 1, 291 (1947), and Jones, Who Are British Protected Persons?, XXII British Year Book of International Law, pp. 122 et seq. (1945).

Since the defendant objected to our considering the certificate of the British Consul in New York, which plaintiffs' counsel tendered at the oral argument of this appeal, to the effect that plaintiffs were British subjects on July 14, 1947, we have paid no attention to that certificate.

It appears from a State Department communication which was before the lower Court that although our Government did not formally recognize India as an independent nation until August 15, 1947, it took steps to recognize the Interim Government of India after its formation on September 2, 1946, by receiving in February 1947 India's first ambassador, whose credentials were signed by the British Crown, and accrediting the first United States ambassador to India in April 1947.

The parties have not directed our attention to any further act of recognition which occurred after the exchange of ambassadors, and we view the statement in the State Department communication to the effect that India did not become independent until August 15, 1947, as being rather in the nature of a legal conclusion which adds little more to the significance of the already existing relations between that Government and our own.

█ Whether the position of India be viewed as of July 14, 1947, when the complaint was filed, or as of January 14, 1953, when the complaint was amended, we think that at both times its international status was such as to give Indian citizens the right to sue in our Federal Courts. True, as of July 14, 1947 our Government had not yet given India *de jure* recognition, but its exchange of ambassadors in February and April 1947 certainly amounted at least to *de facto* recognition, if not more. To all intents and purposes, these acts constituted a full recognition of the Interim Government of India at a time when India's ties with Great Britain were in the process of withering away (see U. S. Foreign Relations 1913, p. 102), which was followed a month later, when partition took place between India and Pakistan, by the final severance of India's status as a part of the British Empire. The significance of these events is not lessened by the fact that the credentials of the first Indian Ambassador to the United States were signed by the British Crown. We think that in its setting that act is more properly to be regarded as a mere expediency

rather than as a significant act of sovereignty in the usual sense of that term. Unless form rather than substance is to govern, we think that in every substantial sense by the time this complaint was filed India had become an independent international entity and was so recognized by the United States.

█ If we are to look only to formalities, it is beyond dispute that India became fully independent on August 15, 1947, when its status as a part of the British Empire finally ended. This was one month after the complaint was filed and five and a half years before the complaint was amended on January 14, 1953. Had the complaint, as amended, been first filed on that date, there would have been no room for argument but that India had long since been recognized by the United States as an independent power in every sense of the term. Since the six-year New York statute of limitations, N.Y.Civil Practice Act § 48(1), which governed this cause of action, had not run at the date of the amendment—the defendant's breach of the contract having occurred on February 25, 1947—it is clear that the complaint, as amended, could have been filed originally at that time. And in view of the fact that the dismissal of the original complaint was "without prejudice," rather than "with leave to amend," we would in any event be disposed to treat the amendment as in effect the filing of a supplemental complaint on January 14, 1953, at which time India was unquestionably an independent foreign power fully recognized by the United States. F.R.C.P. 15(d), 28 U.S. C.A.; see Genuth v. National Biscuit Co., D.C.S.D.N.Y.1948, 81 F.Supp. 213, 214, appeal dismissed for lack of jurisdiction, 2 Cir., 1949, 177 F.2d 962.

The remaining question as to jurisdiction relates to the sufficiency of the proof that the plaintiffs were citizens of India. This proof consisted of a certificate of the Indian Vice Consul at New York that the plaintiffs were "British India Citizens in July 1947 and are now Indian Citizens." The issuance of this certificate was authorized by the Ministry of Ex-

ternal Affairs of India, which in turn acted upon a certificate of the District Magistrate at Delhi, India.

■ Clearly this evidence, if competent, was sufficient to prove the Indian citizenship of the plaintiffs. And we think the evidence was competent. What was sought to be proved was not a foreign record, but a determination of the Indian Government, that the plaintiffs were Indian citizens. The requirements for proof of foreign public records contained in 28 U.S.C.A. § 1741 and §§ 329 and 398 of the New York Civil Practice Act have no application here. The Consular certificate was properly authenticated by the Vice Consul who made it, who also testified that he had acted under instructions from his Government. And the plaintiffs are entitled to the presumption of regularity which has long attached to the procedures of foreign governments and agencies. See United States v. King, 1845, 3 How. 773, 44 U.S. 773, 784–786, 11 L.Ed. 824; Boissonnas v. Acheson, D.C.S.D.N.Y.1951, 101 F. Supp. 138, 153. It is the undoubted right of each country to determine who are its nationals, and it seems to be general international usage that such a determination will usually be accepted by other nations. See Convention on Certain Questions Relating to the Conflict of Nationality Laws, Signed at the Hague, April 12, 1930, Arts. 1 and 2; Briggs, The Law of Nations, pp. 458–60 (2d ed. 1952); Dept. of State Bull. XXII, No. 559, pp. 433–441 (March 20, 1950); Stoeck v. Public Trustee, 2 Ch. 67 (1921). While neither side has given us a judicial decision involving such proof of foreign citizenship as was made here, we entertain no doubt on principle that the proof was competent. Cf. Decision No. 1 of British-Mexican Claims Commission in Great Britain (Lynch Claim) v. Mexico, Decisions and Opinions of the Commissioners, October 5, 1929 to February 15, 1930, pp. 20–23. Our statutes provide for the issuance of certificates of United States nationality to others than naturalized citizens, by the Secretary of State, or by officials to whom he has dele-

gated such power, for use in foreign judicial or administrative proceedings, 8 U.S.C.A. §§ 1502, 1104, and we see no reason why our courts should not give presumptive credit to similar certificates of foreign governments. The defendant has cast no cloud on the validity or accuracy of the consular certificate itself.

We conclude that the District Court had jurisdiction over this action.

■ The defendant claims that its sale of the parachutes to the other Indian concern was not a breach—or at least was an excusable breach—because of the plaintiffs' alleged anticipatory breach of the contract. The alleged breach on the part of the plaintiffs is their failure to procure an extension of either of the letters of credit until after the defendant had sold the parachutes to the other Indian concern. We see no merit whatever to this contention. The contract, as evidenced by the defendant's own writings, called for "delivery *at once,* on receipt of letter of credit * * * " While the defendant sought to prove what would amount to an oral modification of the contract to encompass an obligation by the plaintiffs to keep on extending the letters of credit until shipment was made by the defendant, the lower Court made no such finding, and the record does not support any such alleged modification of the written understandings. The letters of credit were furnished on January 7 and 8, 1947, and when it developed that shipment would not be made before their expiration date, the plaintiffs on their own initiative procured extensions of the letters to February 28, which the defendant accepted. The defendant, without any notice to plaintiffs, sold the parachutes to others on February 25—while the letters of credit were still in full force. We find nothing to support the defendant's professions that it sold to others because of its concern lest the letters of credit be not extended until shipment could be made. Indeed, both the letters of credit and the plaintiffs expressly authorized partial shipments if full shipment could not be effected at one time, and the defendant received notice

of extension of the larger letter of credit after the parachutes, without the plaintiffs' knowledge, had been sold by it. In light of these facts, and the evidence of the plaintiffs' impatience at the delays in shipment, the contention as to the plaintiffs' anticipatory repudiation of the contract is wholly implausible. We hold that the lower Court's finding that "there is no question of the defendant's breach of the contract" is fully supported by the evidence.

We come now to the plaintiffs' contention that the District Court applied the wrong rule of damages. The Court found that prior to February 25, 1947, the date of the defendant's breach, the plaintiffs had contracted to sell to four Indian concerns substantially all of the parachutes which they had purchased from the defendant. The Court further found that subsequent to the defendant's breach the plaintiffs made continuing efforts to purchase similar parachutes but were unsuccessful because none were available on the American market. Both findings are supported by the evidence. On the basis of these findings, plaintiffs contend that they were entitled to recover their loss of profits on the resale, and not merely the difference between the price of the parachutes under their contract with the defendant and the price at which the defendant resold them. We think the plaintiffs are right.

There is no dispute but that the New York rules of damage apply, this being a diversity case. Emerman v. Cohen, 2 Cir., 1952, 199 F.2d 857, 858. In an action for failure to deliver goods the New York rules are these: If there is *an available market* for the goods in question, the measure of damages is the difference between the contract price and the market price, *unless* there are "special circumstances showing proximate damages of a greater amount" (the so-called "special damage" rule). N.Y.Personal Property Law, McK.Consol.Laws,

c. 41, § 148(3). And in such instance the price received by a defaulting seller who has resold may not be used as evidence of market value—Latimer v. Burrows, 1900, 163 N.Y. 7, 57 N.E. 95,—in contrast to the situation where the *buyer* is in default, in which case the seller's resale price may be so used. See N.Y.Personal Property Law, §§ 144 and 145; Van Brocklen v. Smeallie, 1893, 140 N.Y. 70, 35 N.E. 415.

But where, as here, there is *no available market* for the goods in question, the measure of damages "is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract", N.Y.Personal Property Law, § 148(2); and it is well settled that such loss may be measured by the net profits, if not speculative, which the buyer would have earned had the seller performed. Orester v. Dayton Rubber Mfg. Co., 1920, 228 N.Y. 134, 126 N.E. 510; Parrott v. Allison, 2 Cir., 1944, 145 F.2d 415; Emerman v. Cohen, supra. We think this was the rule of damages that should have been applied in this instance, since the Court found that there was no available market for parachutes, and the plaintiffs made specific proof of their loss of profits under their contracts of resale.[4]

The opinion of the District Court shows that it refused to allow the plaintiffs their loss of profits because the defendant had no notice of the plaintiffs' actual or contemplated resale contracts prior to the time it contracted with the plaintiffs. But that principle, exemplified by Czarnikow-Rionda Co. v. Federal Sugar Refining Co., 1930, 255 N.Y. 33, 173 N.E. 913, 88 A.L.R. 1426, on which the lower Court relied, is applicable only in a situation where there is an available market for the goods in question, and the suing party is seeking *special damages* under § 148(3). Here the plaintiffs' loss of profits constituted *general damages* recoverable under § 148(2) because there

4. The question as to whether plaintiffs' loss of profits under their contracts for the resale of 8750 parachutes is a fair measure of their loss of profits on the full lot of 10,000 parachutes will be a matter for the District Court upon the recomputation of damages.

was no available market. See Orester v. Dayton etc., supra, 228 N.Y. at pages 137–139, 126 N.E. 510.

■ Moreover, the Court was also in error in basing its calculation of damages upon the price received by the defendant on its wrongful resale. Where the § 148(3) "available market" or "special damage" rule applies, the seller's resale price may not be taken into account. See Latimer v. Burrows, supra. Where the § 148(2) "no available market" rule applies, the seller's resale price may be considered only in a situation where the buyer's loss of profits is too speculative and there is no other way of measuring damages. See Murphy v. Lifschitz, 1944, 183 Misc. 575, 49 N.Y.S.2d 439, affirmed 1945, 294 N.Y. 892, 63 N.E.2d 26. Here the plaintiffs' loss of profits was not speculative.

We think it evident from Judge Murphy's opinion that his use of the defendant's resale price was not intended as a repudiation of his finding that there was no available market for parachutes. Rather, it seems to have resulted from the mistaken view that § 148 allowed only two measures of damage—market price less contract price and special damages—and that since there was no showing either of an available market or that defendant had notice of possible special damage, the only alternative was to use the defendant's resale price as an element in measuring recovery. But as we have shown, under the circumstances present here § 148(2) provides a third measure, i. e., loss of profits.

■ We regard as wholly untenable the defendant's effort to impugn the bona fides of the plaintiffs' resale contracts. Judge Murphy, who was made fully aware of the alleged irregularities in the depositions and the supposedly "incredible" circumstances attending the making of these resale contracts, found otherwise, and we are presented with nothing that moves us to disturb his finding.

We must reverse on the plaintiffs' appeal and remand the case to the District Court for recomputation of the plaintiffs' damages in accordance with this opinion. On the defendant's cross appeal, we affirm.