924 F.2d 1237
 MORGAN GUARANTY TRUST COMPANY OF NEW YORK, Morgan Grenfell &
Co., Limited, The Bank of Tokyo Limited, The Governor and
Company of the Bank of Scotland and Orion Royal Bank,
Limited, Plaintiffs-Appellees,
v.
REPUBLIC OF PALAU, Defendant-Appellant.
 No. 1427, Docket 89-7096.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 15, 1990.
Decided Feb. 4, 1991.
 
 Wayne A. Cross, New York City (Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel) for Republic of Palau.
 Robert Layton, New York City (Barry R. Satine, Robert B. Wallace, Jonathan D. Schwartz, Darryl S. Lew, Jones, Day, Reavis & Pogue, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, of counsel) for Morgan Guar. Trust Co., et al.
 Before MINER and ALTIMARI, Circuit Judges, KELLEHER, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendant-appellant Republic of Palau ("Palau") appeals from a judgment in the amount of $45,953,703 entered in the United States District Court for the Southern District of New York (Sweet, J.) in favor of plaintiffs-appellees Morgan Guaranty Trust Company of New York, Morgan Grenfell & Co., Limited, The Bank of Tokyo Limited, The Governor and Company of the Bank of Scotland and Orion Royal Bank Limited ("the Banks") following a non-jury trial. The Banks were the guarantors of certain loans made to Palau, a trust territory of the United States, for the construction of an electric power plant and fuel storage facility. Upon Palau's default, the Banks repaid the loans as required by their undertakings and then commenced this action in the New York State Supreme Court to recoup their losses. Claiming to be a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. Sec. 1603(a) (1988), Palau removed the action to the Southern District by invoking the provisions of 28 U.S.C. Sec. 1441(d) (1988), which allows the removal of "[a]ny civil action brought in a State court against a foreign state as defined in 1603(a)."
 
 
 2
 A motion by the Banks to remand the action to the state court from which it was removed, on the ground that Palau was not a sovereign state, was denied by the district court in an Opinion providing an extensive analysis of Palau's status. The court concluded that:
 
 
 3
 Palau has been exercising sovereign powers pursuant to its Constitution adopted in January, 1981, and possesses the attributes of sovereignty which entitle it to the status of "foreign state" pursuant to 28 U.S.C. Sec. 1330, 1441(d). The United States and Palau have commenced a new era of Free Association which effectively terminates the Trusteeship regime, triggering the need to accord Palau the dignity of an equal sovereign and implicating the uniformity and sensitivity goals behind the FSIA. The concept of "de facto " sovereignty, of course, presumes that some further acts are required before complete unfettered sovereignty can be claimed. To ignore Palau's exercise of substantial sovereignty and the effective disintegration of the Trusteeship in favor of formalist indicia of international independence would defeat the concept of de facto sovereignty.
 
 
 4
 Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 639 F.Supp. 706, 716 (S.D.N.Y.1986).
 
 
 5
 The district court thereafter denied a motion by the Banks for summary judgment on their loan guarantee claims and dismissed the two counterclaims interposed by Palau. Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 657 F.Supp. 1475 (S.D.N.Y.1987). Later, a motion by Palau to dismiss the action on the basis of a Joint Resolution of Congress purporting to confer sovereign immunity upon Palau for the purposes of the action was rejected. Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 680 F.Supp. 99 (S.D.N.Y.1988). After trial, the district court issued an Opinion that concluded as follows: "Since the Guarantors have established their prima facie case and Palau has failed to establish its affirmative defense[s] of sovereign immunity, misrepresentation, and mistake, the relief sought in the complaint will be granted." Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 693 F.Supp. 1479, 1499 (S.D.N.Y.1988). Upon a motion made after entry of judgment, the court reconsidered and adhered to its Opinion, refused to vacate the judgment, rejected a request for judgment dismissing the complaint and granted a stay of enforcement of the judgment upon the filing of a supersedeas bond "in the amount of all the interest payments due since default." Morgan Guar. Trust, 702 F.Supp. 60, 66 (S.D.N.Y.1988).
 
 
 6
 We disagree with the district court's conclusion that Palau is a foreign state within the meaning of the FSIA. Accordingly, we find that there was no basis for the exercise of removal jurisdiction in this case and that the district court therefore erred in denying the Banks' motion to remand the action to the New York Supreme Court.
 
 BACKGROUND
 
 7
 Among the tranquil islands of the Southwest Pacific lies a group of approximately 200 islands collectively known as Palau. This archipelago, part of a larger area sometimes referred to as the Caroline Islands, is home to fewer than 15,000 inhabitants. Brushed by the trade winds, Palau lies 600 miles east of the Philippines and 4,000 miles west of Hawaii. There is no industry in Palau, but its waters contain an abundance of fish of various species, and fishing is the principal commercial activity there. There is some tourism, which may be expanded as the result of some recently-discovered opportunities for recreational diving. See Toomb, Palau: In lush lagoons of the South Pacific, a 900-foot cliff, N.Y. Times, Dec. 30, 1990, Sec. 5, at 12, col. 1. These islands are most important for their strategic location, which over the years has been a matter of great interest to the Pacific powers. Most of the islands of Micronesia, including Palau, were governed by Japan under a League of Nations mandate between World War I and World War II. In 1947 the United Nations Security Council and the United States entered into a Trusteeship Agreement whereby the United States was designated Trustee of the more than 2,100 islands formerly governed under the Japanese mandate. See Trusteeship Agreement for the Former Japanese Mandated Islands, Approved by the Security Council on April 2, 1947, entered into force July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189 (1947). The Trust Territory was comprised of three major archipelagos: the Northern Marianas, the Carolines and the Marshalls, and was designated in the Agreement as the "Trust Territory of the Pacific Islands."
 
 
 8
 According to the Trusteeship Agreement, the United States is obligated to provide for the trust territory's economic, political and social advancement and to "foster the development of such political institutions as are suited to the trust territory and [to] promote the development of the inhabitants of the trust territory toward self-government or independence...." Trusteeship Agreement art. 6(1). Resolutions of the United Nations General Assembly define self-government to include free association with the governing trustee. G.A.Res. 742, 1541, 2625. The classification of the trust territory as a strategic area under the supervision of the United Nations Security Council signifies that any alteration or amendment of the Agreement must be approved by the Council. U.N. Charter art. 83. As to non-strategic trusts, the supervisory functions are performed by the General Assembly on behalf of the United Nations. U.N. Charter art. 85. By identifying the trust as "strategic," the parties to the Agreement have recognized the importance of the trust territory to the maintenance of peace in that area of the world.
 
 
 9
 The powers of the United States as Trustee of the Pacific Trust Territory are defined in Article 3 of the Trusteeship Agreement:
 
 
 10
 The administering authority shall have full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement, and may apply to the trust territory, subject to any modifications which the administering authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements.
 
 
 11
 For purposes of governance and administration, the United States has divided the trust territory into four separate political entities: the Northern Mariana Islands; the Marshall Islands; the Federated States of Micronesia (a federation comprised of Truk, Ponape, Kosrae and Yap); and Palau. (The entire trust territory sometimes is referred to as "Micronesia," although it does not include all the Pacific Islands collectively known as Micronesia.) Over the years, these islands have been afforded increasing responsibility for their own governance, and each now has negotiated agreements for permanent changes in political status: to a commonwealth in the case of the Northern Mariana Islands, and to a political status of free association with the United States in the others. Except for the Republic of Palau, all the political entities created from the trust territories have approved the negotiated agreements. Accordingly, on November 3, 1986, President Ronald Reagan issued a Presidential Proclamation purporting to create the Commonwealth of the Northern Mariana Islands; the Republic of the Marshall Islands; and the Federated States of Micronesia; and to terminate the trusteeship as to those entities. Proclam. No. 5564, 3 C.F.R. Sec. 146 (1986).
 
 
 12
 In the case of Palau, the negotiated agreement known as the Compact of Free Association never has been approved by the Palauan people in accordance with their Constitution. The Compact would confer full powers of governmental administration upon the Republic of Palau, since it provides for political autonomy except as to defense and security matters. Originally, the responsibility for the civil administration of the entire territory was delegated to the Secretary of the Navy by Executive Order. Thereafter, an Executive Order transferred administration to the Secretary of the Interior. In 1954, Congress specifically authorized the trust territory to be administered by Executive Order, 48 U.S.C. Sec. 1681, and, effective July 1, 1962, an Executive Order provided for continued administration by the Secretary of the Interior. Exec. Order No. 11,021, 27 Fed.Reg. 4,409 (1962). Eventually, in 1968, the Secretary of the Interior established the Trust Territory Government, with executive, legislative and judicial components. Sec. Order No. 2918, 34 Fed.Reg. 157 (1968). In 1979 the Secretary issued an Order entitled: "Recognition of Governmental Entities Under Locally-Ratified Constitutions in the Trust Territory of the Pacific Islands." Sec. Order No. 3039, 44 Fed.Reg. 28,116 (1979). This Order allowed the transfer to the island nations of the functions of the Trust Territory Government. It was pursuant to that Order that Palau adopted its Constitution, effective January 1, 1981. The Constitution includes a provision requiring approval by 75% of the registered voters of any agreement that authorizes the "use, testing, storage or disposal of nuclear, toxic chemical, gas or biological weapons intended for use in warfare." Palau Const. art. II, Sec. 3.
 
 
 13
 The Compact of Free Association between the United States and Palau originally was submitted for approval by the Palauan people with the condition that a separate bilateral agreement would be entered into permitting the United States to locate nuclear devices in Palau. After two plebiscites failed to produce the 75% approval required by the Palau Constitution, the Compact was renegotiated to allow the United States to "operate nuclear capable or nuclear propelled vessels and aircraft within the jurisdiction of Palau without either confirming or denying the presence or absence of such weapons within the jurisdiction of Palau." See Compact of Free Association, Pub.L. No. 99-658, tit. III, Sec. 324, 100 Stat. 3672 (1986). The Compact as modified was approved by a 72% margin in a plebiscite held on February 21, and reported on February 24, 1986. Because of the change in the nuclear use provision, the Compact was thought to be outside the 75% requirement on the third go-around. Accordingly, the Compact was considered adopted and was approved by Congress and the President of the United States. See Approval of the Compact of Free Association with the Government of Palau, Pub.L. No. 99-658, tit. I, Sec. 101, 100 Stat. 3672 (1986); Exec. Order No. 12,569, 51 Fed.Reg. 37,171 (1986).
 
 
 14
 Shortly after the approval of the Compact by Congress and the President, the Supreme Court of Palau determined that the revised language of the Compact did not serve to eliminate the 75% majority requirement and held that the Compact had not been approved at the third referendum. See Gibbons v. Salii, No. 8-86, at 2 (Sup.Ct. Palau, App.Div. Sept. 17, 1986). Since the plebiscite of February 21, 1986, four additional plebiscites have been held, the latest on February 6, 1990. A 75% majority never was attained, and the nuclear presence question remains an obstacle to the full autonomy for Palau promised by the Compact of Free Association. It is clear that the Compact never has entered into force, that the Republic of Palau retains the status of a United Nations Trust Territory administered by the United States, and that the United States continues to carry out its duties and responsibilities as Trustee.
 
 
 15
 In examining the "sovereign attributes" of the Republic of Palau, the district court made the following observations:
 
 
 16
 So long as the [Trust] Agreement remains in place, the Department of the Interior acting through the High Commissioner retains the nominal power to screen budgets, conduct audits and process federal aid grants for the executive branch, and retains the power in certain circumstances to suspend laws approved by the Congress of Palau. The Interior Secretary still appoints the Justices of the High Court of Palau. However, this de jure approach eclipses the new political relationship which the Compact has established between the United States and Palau; a de facto relationship which is carrying Palau forward to free association before the structure of the old Trusteeship is dismantled.
 
 
 17
 Morgan Guar. Trust, 639 F.Supp. at 713.
 
 
 18
 In point of fact, resolution of the free association question remains very much on "hold," and the dismantling of the "old Trusteeship" is nowhere in sight. The United States government continues to hold the power to suspend laws enacted by the Palau legislature that are inconsistent with treaties, agreements or laws of the United States. Sec. Order No. 3039, 44 Fed.Reg. 28,116 (1979). The Department of the Interior now exercises that authority through an Assistant Secretary rather than a High Commissioner, as was the case before 1987. Sec. Order No. 3119, 52 Fed.Reg. 27,859 (1987). We take judicial notice of Order No. 3142, 55 Fed.Reg. 43,221 (1990), signed by the Secretary of the Interior on October 15, 1990, which appears to expand the authority of the Assistant Secretary to supervise the domestic and foreign affairs of Palau.
 
 
 19
 This action had its genesis in a proposal made by International Power Systems Company Ltd. of London ("IPSECO") in September 1981 for the construction of a diesel power plant and fuel storage facility in Palau. Palauan officials were convinced that a reliable source of electric power was essential for the future development of their archipelago, including the establishment of a tourist trade. They also were convinced that additional revenue could be derived from a tank farm to be built in conjunction with the power plant. Gordon Mochrie, IPSECO's president, apparently represented to them that such a Project would be self-financing. Two months later, Palau's legislature, the Olbiil Era Kelulau ("OEK") enacted Republic of Palau, Public Law ("RPPL") 1-20, the National Government Private Borrowing Act. The Act delegated to the President of Palau the authority to borrow up to $35 million dollars for the Project from non-governmental sources.
 
 
 20
 IPSECO sought out Morgan Grenfell & Co., Limited to prepare a financing package, and a meeting to discuss the matter was attended in September of 1982 by Palauan officials and representatives of Morgan Grenfell and IPSECO. At the meeting, a financing package for the Project was discussed, and IPSECO made a presentation of projected revenues. Thereafter, Morgan Grenfell assembled a syndicate consisting of appellee Banks to guarantee repayment of the loan to the prime lenders and to the Export Credit Guarantee Department ("ECGD") of the British Government. At a meeting held in London in November, 1982, Mochrie of IPSECO again represented to Palauan officials that the Project would be self-financing. The Morgan Grenfell representative indicated that his company could not agree or disagree as to revenue projections but was relying on Palau's "sovereign risk" for repayment.
 
 
 21
 On February 24, 1983, President Remeliik of Palau signed loan agreements with the ECGD. In March of 1983, Chief Ibedul Gibbons, Mayor of Koror, Palau's principal state, initiated an action in the Palauan courts challenging the loan agreements. One of his contentions was that the agreement was a government-to-government loan as to ECGD and therefore not authorized by law. Later that month, Palauan Attorney General Victorio Uherbelau met with EDGD attorneys in Washington, D.C. and reviewed proposed legislation granting President Remeliik the authority to execute government-to-government loans, appropriating funds to insure repayment of the loans and authorizing the president to waive sovereign immunity. Palau was informed that the legislation was necessary to secure the participation of ECGD.
 
 
 22
 The OEK held hearings on the legislation commencing April 21, 1983 and shortly thereafter passed RPPL 1-54, authorizing the President to enter into government-to-government loans. The legislation created a revolving Project Fund for the deposit of Project revenues from which loan principal and interest would be paid. The OEK also authorized the appropriation of funds necessary to repay the loans and granted the President the authority to waive sovereign immunity to the extent consistent with the Constitution of Palau. The committee reports of both houses of the OEK clearly indicate that the members of the OEK believed that the Project would be self-financing.
 
 
 23
 When RPPL 1-54 was submitted to the High Commissioner for review in accordance with the Trust Agreement and the Secretarial Order then in effect, the High Commissioner suspended the waiver of sovereign immunity provision on May 5, 1983. Meanwhile, on April 23, 1983, Ibedul Gibbons had transmitted a letter to each of the bankers asking confirmation of IPSECO's representations that the Project would be self-supporting. Although the Banks discussed among themselves a response to the letter, they never forwarded a written answer. At a meeting with the Palauans on May 9, 1983 at which Mochrie made a detailed presentation showing that the Project would be self-supporting and invited the Banks to compare his figures with those of Ibedul Gibbons, a bank representative stated only that "regardless of the Project's revenues, the Palauans must meet their obligations under the loan agreements."
 
 
 24
 The Palauans and Mochrie requested that the United States consider reversing the High Commissioner's suspension of RPPL 1-54. The suspension never was reversed, but the U.S. State Department, on May 25, 1983, did transmit a "Note Verbale" to the British Government noting U.S. Government support for Palau's efforts to improve its power generating capacity and stating that Palau would have $28 million dollars to service the loans when the Compact of Free Association took effect. In the meantime, according to the Note, Palau would receive U.S. aid which could be used to service the loans. A copy of the Note was furnished to the Banks.
 
 
 25
 On June 6, 1983, the Inspector General of the Department of the Interior advised President Remeliik by letter not to enter into the loan agreement or the construction contract because the Department had concluded that Palau could not service the debt. President Remeliik chose not to relay this advice to Vice-President Oiterong, who executed the loan agreement with the primary lenders and the coordination and recourse agreements with the bankers on June 8, 1983 in London. In a letter to the Inspector General several months later, Remeliik said that he had not relayed the Inspector General's advice to Oiterong because it would have confused the matter in light of the Note Verbale.
 
 
 26
 Although it appears that the electric power plant and tank farm have been constructed, the Project never has become self-supporting. There are no major users of power generated by the plant other than the Government of Palau itself. The Palauans have not been instructed in the use of the tank farm by IPSECO, which is defunct. As a consequence, Palau defaulted on a payment due on March 4, 1985, and the Banks were constrained to reimburse the primary lenders. As agreed by the parties, the total amount due the guarantors as of December 5, 1985 was $35,064,493.42. After making an unsuccessful demand on Palau for repayment, this action was commenced in the New York Supreme Court on December 17, 1985 in accordance with a provision in the recourse agreements allowing enforcement in New York under the Foreign Sovereign Immunities Act commercial activity exception. As previously noted, the action was removed to the United States District Court for the Southern District of New York, which denied a motion to remand for lack of subject matter jurisdiction. The Joint Resolution of Congress enacted on November 14, 1986, approving the Compact of Free Association, Pub.L. No. 99-658, tit. I, Sec. 104(e), 100 Stat. 3672, 3676 (1986), purported to grant sovereign immunity to Palau "with respect to any action based on a contract or debt related to any electrical generating plant or related facilities" undertaken prior to the date of the Joint Resolution. 48 U.S.C. Sec. 1681 Note.
 
 
 27
 The district court held that the immunity of Palau was waivable and that the President of Palau properly had waived it. Ultimately, the district court, following a bench trial, concluded that Palau had failed to show fraudulent inducement despite prior misrepresentation by the Banks with regard to the self-sufficiency of the Project. The district court determined that the element of reliance, essential to a finding of fraudulent inducement, could not be established in the face of the June 6 advisory letter to President Remeliik from the Department of the Interior. This determination paved the way for the entry of the money judgment subject of this appeal.DISCUSSION
 
 
 28
 The removal jurisdiction of the district court in this case depends upon the district court's determination that the Republic of Palau is a foreign state within the definition of the Foreign Sovereign Immunities Act. 28 U.S.C. Secs. 1441(d) and 1603(a). Section 1441(d) provides that
 
 
 29
 [a]ny civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending.
 
 
 30
 Although the Banks resisted removal of the action from the Supreme Court, New York County, to the United States District Court for the Southern District of New York, the "district ... embracing the place where [the] action [was] pending," they now argue that removal jurisdiction properly was exercised. Their change of position may in part be due to the fact that they have prevailed in the district court and have a large judgment to protect. Even if they had commenced the action in the district court by invoking original jurisdiction under the Foreign Sovereign Immunities Act, however, they would be constrained to demonstrate that Palau is a sovereign state. 28 U.S.C. Sec. 1330(a) provides that
 
 
 31
 [t]he district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.
 
 
 32
 It seems clear that, if Palau is a foreign state within the definition of section 1603(a), it is not immune from jurisdiction under the Federal Sovereign Immunities Act because the transactions subject of this action fall within the commercial activity exception. 28 U.S.C. Sec. 1605(a)(2).
 
 
 33
 Although both the removal and original jurisdiction provisions refer to the definition of foreign state found in section 1603(a), the section is more descriptive than definitional:
 
 
 34
 A "foreign state", except as used in section 1608 of this title [pertaining to service], includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b) [defining agency or instrumentality of foreign state].
 
 
 35
 To resolve the dispute whether the Republic of Palau is a foreign state subject to original or removal jurisdiction, it therefore is necessary to examine other sources for guidance.
 
 
 36
 In United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318-319, 57 S.Ct. 216, 220-221, 81 L.Ed. 255 (1936), the Supreme Court listed the following attributes of sovereign statehood: the power to declare and wage war; to conclude peace; to maintain diplomatic ties with other sovereigns; to acquire territory by discovery and occupation; and to make international agreements and treaties. Under international law, a state is said to be an entity possessed of a defined territory and a permanent population, controlled by its own government, and engaged in or capable of engaging in relations with other such entities. Restatement (Third) of the Foreign Relations Law of the United States Sec. 201 (1987) ("Restatement 3d "). We recently referred to this definition in the course of holding that recognition of a state that satisfies the elements of the definition does not require recognition of the particular government in control of the state. National Petrochemical Co. of Iran v. M/T Stolt Sheaf, 860 F.2d 551, 553 (2d Cir.1988), cert. denied, 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989).
 
 
 37
 According to international law, a sovereign state has certain well accepted capacities, rights and duties:
 
 
 38
 (a) sovereignty over its territory and general authority over its nationals;
 
 
 39
 (b) status as a legal person, with capacity to own, acquire, and transfer property, to make contracts and enter into international agreements, to become a member of international organizations, and to pursue, and be subject to, legal remedies;
 
 
 40
 (c) capacity to join with other states to make international law, as customary law or by international agreement.
 
 
 41
 Restatement 3d Sec. 206.
 
 
 42
 Palau simply does not have the attributes of statehood, and cannot be considered a foreign sovereign. See World Communications Corp. v. Micronesian Telecomms. Corp., 456 F.Supp. 1122 (D.Haw.1978); People of Saipan v. United States Dep't of Interior, 356 F.Supp. 645 (D.Haw.1973), aff'd as modified, 502 F.2d 90 (9th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). We are willing to accept the proposition that a trust territory held under United Nations auspices is not a territory "belonging to the United States" within the meaning of the territorial clause of the Constitution. U.S. Const. art. IV, Sec. 3, cl. 2. Accordingly, the authority to govern Palau does not rest upon the rule-making powers granted to Congress by the Constitution for the regulation of territories or other property that "belong" to the United States. Id. Rather, it is the Trusteeship Agreement, entered into under the treaty-making power of the Constitution, that provides the authority for the governance of Palau by the United States. U.S. Const. art. II, Sec. 2, cl. 2. See McKibben, The Political Relationship Between the United States and Pacific Islands Entities: The Path to Self-Government in the Northern Mariana Islands, Palau, and Guam, 31 Harv.Int'l L.J. 257, 264 (1990). The Trusteeship Agreement, of course, confers upon the United States "full power of administration, legislation and jurisdiction over the territory," as well as the right to apply "such of the laws of the United States as it may deem appropriate." A more wide-ranging authority to govern is hard to imagine. The United States exercised that authority at the time of the transactions giving rise to this action, and continues to exercise it.
 
 
 43
 We take judicial notice of the fact that the United Nations Security Council has approved the termination of the trusteeship arrangement as to the Northern Mariana Islands, which has acquired the status of commonwealth, and the Marshall Islands and the Federated States of Micronesia, both of which have agreed to Compacts of Free Association with the United States. N.Y. Times, Dec. 24, 1990, at A5, col. 1. Palau therefore is the sole remaining part of the Pacific Trust Territory remaining under the trusteeship. It seems clear that Palau must continue as a trust territory until the United Nations Security Council acts to relieve the United States of its responsibilities under the trust. See Clark, Self-Determination and Free Association--Should the United Nations Terminate the Pacific Islands Trust?, 21 Harv.Int'l L.J. 1, 6 (1980).
 
 
 44
 While Palau's approval of a Compact of Free Association might hasten the day, the status quo continues. See generally Armstrong & Hills, The Negotiations for the Future Political Status of Micronesia (1980-1984), 78 Am.J.Int'l L. 484 (1984). Whether United Nations termination of the Pacific Territory Trust as to Palau is essential for Palau to be considered a foreign state within the meaning of the Foreign Sovereign Immunities Act is a question that need not be answered here. While it appears to us that termination at least is necessary to the acquisition of de jure status, the district court determined that Palau has achieved a de facto status as a foreign state, and it is to this determination that we now turn.
 
 
 45
 The district court found that the Compact of Free Association between the United States and Palau, "which was ratified in a Palauan plebiscite on February 24, 1986," served to establish "Palau's independent sovereignty and equal diplomatic status in the international community." Morgan Guar. Trust, 639 F.Supp. at 709. This finding of ratification, erroneous in light of subsequent events, underlies the district court's conclusion that the trusteeship has been "effectively" terminated and that Palau has "de facto " sovereignty with only some "further acts" standing in the way of "complete unfettered sovereignty." Id. at 716. In fact, the Compact of Free Association never has been ratified by Palau, and the limited powers of self-government afforded to Palau under its Constitution do not justify a finding of "de facto" sovereignty.
 
 
 46
 It seems to us that a political entity whose laws may be suspended by another cannot be said to be possessed of sovereignty of any kind, de facto or de jure. That is the case with respect to the United States and Palau. Moreover, the Palauan courts are not independent of the United States. The Justices of the High Court of Palau are appointed by the Secretary of the Interior, and the court is constrained to apply the law of the United States in effect in the territory, including the executive orders of the Secretary of the Interior. See Matter of Bowoon Sangsa Co., Ltd., 720 F.2d 595, 600-01 (9th Cir.1983). This, too, is inconsistent with the concept of sovereignty. In Bowoon Sangsa, the Ninth Circuit characterized Palau as "quasi-sovereign." Id. at 602. The district court in this case recognized the authority of the High Commissioner (now the Secretary of the Interior) to screen budgets, conduct audits and process grants for the executive branch of the Palauan government. The reality is that the United States has ultimate authority over the governance of Palau, see Sablan Constr. Co. v. Government of Trust Territory, 526 F.Supp. 135, 141 (D.N.Mar.I., App.Div.1981), and it therefore cannot be said that Palau is an entity "under the control of its own government," Restatement 3d Sec. 201. Neither can it be said to be sovereign over its own territory, with general authority over its nationals in the manner contemplated by Restatement 3d Sec. 206(a).
 
 
 47
 The absence of sovereign attributes is manifest in the actions taken by the United States in connection with the transactions subject of this lawsuit. The High Commissioner suspended the immunity waiver contained in the Palauan legislation authorizing government-to-government loans; the Inspector General of the Department of the Interior advised President Remeliik not to enter into the loan agreement and the construction contract; and a joint resolution of Congress purported to confer immunity upon Palau, even after the signing and waiver, with regard to any action pertaining to the electrical generating plant or related facility. These intrusions into governmental control hardly reflect "some theoretical limitation to independence." See Casenote, Birth of a Nation: The Republic of Palau is Recognized as a Foreign Sovereign Under the Foreign Sovereign Immunities Act of 1976--Morgan Guaranty Trust v. Republic of Palau, 639 F.Supp. 706 (S.D.N.Y.1986), 1987 B.Y.U.L.Rev. 709, 717. Rather, they call into question some well-established indicia of sovereignty: the capacity to enter into contracts and to acquire, own and transfer property. Restatement 3d Sec. 206(b).
 
 
 48
 Apparently, the Compact of Free Association would establish for Palau separate authority and responsibility for the conduct of foreign affairs, the authority to be exercised on the basis of cooperation and consultation between the governments of the United States and Palau. See Hills, Compact of Free Association for Micronesia: Constitutional and International Law Issues, 18 Int'l Law. 583, 604-05 (1984). That is not the current situation, nor was it the situation at the time of the transactions giving rise to this action. Although it is true that Palau has entered into some fisheries and marine resources treaties and has sent representatives to international conferences, it has done so with the approval of the United States, at whose sufferance it conducts foreign relations under the provisions of the Palauan Constitution. Palauan laws and treaties may not be inconsistent with United States treaties or international agreements, and this has been the case during the entire period of trusteeship. See Gale v. Andrus, 643 F.2d 826, 829 (D.C.Cir.1980). Under the present Executive Order, even communications with foreign governments by the Republic of Palau must follow consultation with, and approval by, the Department of State. The power to maintain diplomatic ties with other sovereigns and to make international agreements and treaties, Curtiss-Wright Export Corp., 299 U.S. at 318, 57 S.Ct. at 220, and the capacity to join with other states to make international law, Restatement 3d Sec. 206(c), are rights of sovereignty not possessed by Palau.
 
 
 49
 "While the traditional definition [of state] does not formally require it, an entity is not a state if it does not claim to be a state." Restatement 3d Sec. 201 comment f. It is significant here that Palau does not now argue, as it did when this action was removed from the state court, that it is a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act. The following appears in Palau's Supplemental Brief, submitted in response to the court's request for additional briefing on the issue of subject matter jurisdiction:
 
 
 50
 When Palau removed this case in 1986 pursuant to the FSIA it appeared that its emergence as a fully autonomous sovereign state was both imminent and inevitable. It was on that basis that the District Court concluded that it was de facto a sovereign state. Palau submits that the aspirations of its people to become sovereign continue to make such sovereignty inevitable. The imminency of that result, however, is less certain than it appeared in 1986 in light of the tension between the Compact's requirement of nuclear transit for the United States and Palau's constitutional prohibition on such nuclear presence.
 
 
 51
 The Banks rely heavily on Murarka v. Bachrack Bros., Inc., 215 F.2d 547 (2d Cir.1954), to support their claim of de facto sovereignty. That case is inapposite. Murarka was a partnership doing business in Delhi, India that sued a New York corporation in the district court for breach of a contract to purchase war surplus parachutes. In holding that the plaintiff partners were citizens of a foreign state for jurisdictional purposes although India was not yet fully independent, the court made several observations. First, it observed that only one month had elapsed between the filing of the complaint and the complete independence of India. Second, it reported that there had been an exchange of Ambassadors between the United States and India prior to the commencement of the action. Third, it found that the British Parliament enacted the India Independence Act only four days after the complaint was filed. Fourth, it observed that final independence had been attained five and one-half years before the complaint was amended. The court concluded that "[u]nless form rather than substance is to govern, we think that in every substantial sense by the time this complaint was filed India had become an independent international entity and was so recognized by the United States." Id. at 552.
 
 
 52
 The situation in Murarka must be contrasted with the situation in the case at bar. The court in Murarka found "a full [de facto] recognition of the Interim Government of India at a time when India's ties with Great Britain were in the process of withering away." Id. The ties between the United States and Palau are not yet in the process of withering away. The district court's assumption that the Compact of Free Association had been ratified and that the transition to full autonomy was inevitable and imminent proved to be mistaken in light of subsequent events. In Murarka, full sovereignty was imminent and inevitable. Certainly, there has been no exchange of Ambassadors as in Murarka and no recognition of Palau's sovereignty by the United States or the United Nations. Palau itself concedes that the time of its attainment of sovereignty cannot be estimated. In its Supplemental Brief, Palau concedes that the United States continues to exercise significant day to day control over Palau's affairs, including its legislation. According to the Brief, "[w]hile Palau deplores this degree of control and believes that it is inimical to its emergence to full sovereignty[,] it remains a fact."
 
 
 53
 Our conclusion in this case well may have been different had the Compact of Free Association been fully approved by the parties to the Compact. Such approval would have marked the entry of Palau into the final stage of its transition to self-government and would have signalled the certain and unavoidable termination of the Trusteeship. See United States v. Covington, 783 F.2d 1052, 1056 (9th Cir.1985) (confession given in Republic of the Marshall Islands after approval of free association status treated as given in "foreign country"), cert. denied, 479 U.S. 831, 107 S.Ct. 117, 93 L.Ed.2d 64 (1986); Commonwealth of Northern Mariana Islands v. Atalig, 723 F.2d 682, 687 (9th Cir.) (application of local law after approval of Covenant granting Commonwealth status to Northern Mariana Islands), cert. denied, 467 U.S. 1244, 104 S.Ct. 3518, 82 L.Ed.2d 826 (1984). Subject to the control of its internal and external affairs by the United States, deficient in all the major attributes of statehood, its Compact of Free Association remaining unapproved after seven plebiscites, the Republic of Palau concedes its lack of sovereignty. We are constrained to agree.
 
 CONCLUSION
 
 54
 In view of all the foregoing, we conclude that the Republic of Palau is not a foreign sovereign within the meaning of the Foreign Sovereign Immunities Act and that jurisdiction for the removal of the action to the district court therefore was lacking. We vacate the judgment of the district court and direct that an order be entered there remanding the action to the Supreme Court, New York County, from which it was removed.
 
 
 
 *
 Hon. Robert J. Kelleher, United States District Court, Central District of California, sitting by designation